# Civil Cover Sheet

Trial Division

For Prothonotary Use Only (Docket Number)

MARCH 2020

**000816**

E-Filing Number: 2003016441

**PLAINTIFF'S NAME**
ECLIPSE LIQUIDITY, INC.

**DEFENDANT'S NAME**
GEDEN HOLDINGS. LTD

**PLAINTIFF'S ADDRESS**
REPUBLIC OF MALTA
N/A

**DEFENDANT'S ADDRESS**
C/O CT CORPORATION SYSTEM  600 N. 2ND ST.,
SUITE 401
HARRISBURG PA 17101

**PLAINTIFF'S NAME**

**DEFENDANT'S NAME**
ADVANTAGE TANKERS LLC

**PLAINTIFF'S ADDRESS**

**DEFENDANT'S ADDRESS**
C/O SEARCH TEC. INC. 314 NORTH 12TH STREET, STE
100
PHILADELPHIA PA 19107

**PLAINTIFF'S NAME**

**DEFENDANT'S NAME**
ADVANTAGE AWARD SHIPPING, LLC

**PLAINTIFF'S ADDRESS**

**DEFENDANT'S ADDRESS**
C/O SEARCH TEC. INC. 314 NORTH 12TH STREET, STE
100
PHILADELPHIA PA 19107

**TOTAL NUMBER OF PLAINTIFFS**
1

**TOTAL NUMBER OF DEFENDANTS**
3

**COMMENCEMENT OF ACTION**
- [x] Complaint
- [ ] Writ of Summons
- [ ] Petition Action
- [ ] Transfer From Other Jurisdictions
- [ ] Notice of Appeal

**AMOUNT IN CONTROVERSY**
- [ ] $50,000.00 or less
- [x] More than $50,000.00

**COURT PROGRAMS**
- [ ] Arbitration
- [ ] Jury
- [ ] Non-Jury
- [ ] Other:
- [ ] Mass Tort
- [ ] Savings Action
- [ ] Petition
- [x] Commerce
- [ ] Minor Court Appeal
- [ ] Statutory Appeals
- [ ] Settlement
- [ ] Minors
- [ ] W/D/Survival

**CASE TYPE AND CODE**
1O - CONTRACTS OTHER

**STATUTORY BASIS FOR CAUSE OF ACTION**

**RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)**

**FILED
PRO PROTHY**

MAR 06 2020

A. SILIGRINI

**IS CASE SUBJECT TO
COORDINATION ORDER?**
YES        NO

## TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: ECLIPSE LIQUIDITY, INC.

Papers may be served at the address set forth below.

**NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY**
MICHAEL F. SCHLEIGH

**ADDRESS**
REEVES & MCEWING, LLP
1004 S. FRONT ST.
PHILADELPHIA PA 19147

**PHONE NUMBER**
(267) 324-3773

**FAX NUMBER**
(267) 519-9463

**SUPREME COURT IDENTIFICATION NO.**
88407

**E-MAIL ADDRESS**
mschleigh@lawofsea.com

**SIGNATURE OF FILING ATTORNEY OR PARTY**
MICHAEL SCHLEIGH

**DATE SUBMITTED**
Friday, March 06, 2020, 04:36 pm

FINAL COPY (Approved by the Prothonotary Clerk)

This case is subject to the Commerce Program because it is not an arbitration matter and it falls within one or more of the following types (check all applicable):

1. Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g. Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;

**X** 2. Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:

      a. Uniform Commercial Code transactions;

      b. Purchases or sales of business or the assets of businesses;

    **X**  c. Sales of goods or services by or to business enterprises;

      d. Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;

      e. Surety bonds;

      f. Purchases or sales or leases of, or security interests in, commercial, real or personal property; and

      g. Franchisor/franchisee relationships.

3. Actions relating to trade secret or non-compete agreements;

**X** 4. "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;

5. Actions relating to intellectual property disputes;

6. Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;

7. Derivative actions and class actions based on claims otherwise falling within these ten types, such as shareholder class actions, but not including consumer class actions, personal injury class actions, and products liability class actions;

8. Actions relating to corporate trust affairs;

9. Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Comprehensive General Liability policy;

10. Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
COURT OF COMMON PLEAS OF PHILADELPHIA

*Prothonotary and Attested by the Office of Judicial Records 06 MAR 2020 04:56 pm E. PELLEGRINI*

```
-------------------------------------x
ECLIPSE LIQUIDITY, INC.,            §
                                    §          TERM 2020
       Plaintiff,                   §
                                    §
  - against -                       §  No.
                                    §
                                    §
GEDEN HOLDINGS, LTD;                §
ADVANTAGE TANKERS                   §
LLC; and ADVANTAGE                  §
AWARD SHIPPING, LLC                 §
                                    §
       Defendants.        §
-------------------------------------x
```

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| **You have been sued in court.** If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| *You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.* | *Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.* |
| **Philadelphia Bar Association**<br>**Lawyer Referral**<br>**and Information Service**<br>**1101 Market St., 11th Floor**<br>**Philadelphia, Pennsylvania 19107**<br>**(215) 238-6333** | **Asociacion De Licenciados**<br>**De Filadelfia**<br>**Servicio De Referencia E**<br>**Informacion Legal**<br>**1101 Market St., 11th Piso**<br>**Filadelfia, Pennsylvania 19107**<br>**(215) 238-6333** |

**10-284**

REEVES & McEWING, LLP
Mary Elisa Reeves, Esq.
Michael F. Schleigh, Esq.
PA Id No. 44194/88407
1004 S. Front Street
Philadelphia, PA 19147
Telephone: 267-324-3773
E-mail: reeves@lawofsea.com



*Attorneys for Plaintiff Eclipse Liquidity, Inc.*



IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

--------------------------------------------------x
ECLIPSE LIQUIDITY, INC.                    §
                                           §          **TERM 2020**
                                           §
                    Plaintiff,             §
                                           §          **No.**
        - against -                        §
                                           §
                                           §
                                           §
**GEDEN HOLDINGS. LTD;**                   §
**ADVANTAGE TANKERS**                      §
**LLC; and ADVANTAGE**                     §
**AWARD SHIPPING, LLC**                    §
                                           §
                    Defendants.            §
--------------------------------------------------x

### ORIGINAL COMPLAINT

Plaintiff Eclipse Liquidity, Inc. files this Complaint against Defendants Geden Holdings,

Ltd; Advantage Tankers, LLC; and Advantage Award Shipping, LLC as a judgment creditor of

Geden Holdings, Ltd. and for its claims against the said Defendants avers as follows:

### PARTIES JURISDICTION AND VENUE

1.       At all times material hereto Plaintiff Eclipse Liquidity, Inc. (hereinafter Plaintiff)

is a corporate entity established under the laws of the Republic of the Marshall Islands.

2. At all times material hereto Defendant Geden Holdings, Ltd. is a corporate entity organized under the laws of Malta. At all times material hereto Geden Holdings Ltd. was registered as a foreign corporation in the State of Pennsylvania where it may be served with process at the Office of the Secretary of State. A copy of the registration record of Geden Holdings Ltd. is attached to this Complaint as EXHIBIT 1.

3. At all times material hereto Defendant Advantage Award Shipping, LLC (hereinafter "Award LLC") was and is a limited liability company organized under the laws of the Bahamas. Award LLC is also registered and qualified as a foreign corporate entity in the Republic of the Marshall Islands. Award LLC. is registered as a foreign corporation in the State of Pennsylvania where it may be served with process at the address of its registered agent's office at Search Tec. Inc. 314 North 12th Street, Suite 100, Philadelphia, PA 19107. A copy of the registration record of Advantage Award Shipping, LLC is attached to this Complaint as EXHIBIT 2.

4. Both Defendant Geden Holdings, Ltd. and Defendant Advantage Award Shipping, LLC voluntarily and purposely submitted to the jurisdiction of the State of Pennsylvania and purposely sought and availed themselves the protection its laws provide to residents of the state. That protection is that under the supplemental Federal Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions the property of residents of the forum may not be attached with admiralty process of maritime attachment and garnishment. To this end both of the said defendants registered as foreign corporations and respectively appointed agents for service of process in the State of Pennsylvania.

5. At all times material hereto Advantage Tankers, LLC. (hereinafter "Advantage Tankers") was a limited liability company organized under the laws of the Republic of the Marshall Islands with its principal place of business in Istanbul, Turkey.

2

all times material hereto Advantage Award Shipping, LLC was a corporate alter ego of Advantage Tankers, LLC. based on the following facts comprising the relationship of the said business entities: Advantage Tankers owned 100% of the limited liability shares of Award LLC; the directors and officers of Advantage Tankers are identical to the directors and officers of Award LLC; Advantage Tankers is the personal guarantor of the indebtedness of Award LLC for the repayment of the loan for the purchase of the vessel ADVANTAGE AWARD; the bank loan for the acquisition of the ADVANTAGE AWARD is cross-collateralized with the loans for the acquisition of the vessels ADVANTAGE ANTHEM and ADVANTAGE ATOM, which are also beneficially owned by Advantage Tankers; the shares of Advantage Tankers in the said vessels were subject to a charge in favor of the financing bank that financed the purchase of the said vessels; the employment of the ADVANTAGE AWARD was entirely under the control of Advantage Tankers; the business of Advantage Tankers is comprised entirely of the business of Award LLC and of 10 other similar one-ship-companies as pled in further detail below at ¶¶ 17, 34,38,42, 51,52, 57,58 and EXHIBIT 6,  and, conversely, apart from the business of Award LLC and the other ten one-ship-companies, Advantage Tankers would not have any business; Award LLC, since its inception, has not operated as a corporate profit-making center of its own, but only as an accessory and an instrumentality of Advantage Tankers.

7.      By reason of the jurisdictional presence of Advantage Award Shipping, LLC in Pennsylvania, its alter ego Advantage Tankers is also present in Pennsylvania as a matter of law.


**VENUE**

8.      The injuries and damages caused to Plaintiff, by and through the acts and omissions of Defendants, occurred in whole or in part in Philadelphia County, Pennsylvania while Defendants Geden Holdings and Award LLC were registered as foreign corporations in the State.

9.      The transactions at issue, and the causes of action complained hereof that are the subject matter of this lawsuit, occurred in whole or in part in Philadelphia County, Pennsylvania.

3

Case ID: 200300816

FACTS

Underlying Obligation and its Origins

10.     Plaintiff, is a judgment creditor of Defendant Geden Holdings, Ltd. (hereinafter "Geden Holdings").  Having obtained a judgment in the High Court in the United Kingdom, that was recognized in Pennsylvania in the amount of $3,479,152.69, and upheld against several challenges made by said defendant in the Court of Common Pleas and the Superior Court[1], Plaintiff has repeatedly demanded of Geden Holdings to honor the judgment. Geden Holdings has persistently ignored the demands and refused to pay the judgment.

11.     The claim in respect of which Plaintiff obtained its judgment against Geden Holdings was brought under Geden Holdings' performance guarantee of an obligation of one of its subsidiaries to purchase a vessel from Plaintiff – the Motor Tanker AVOR.   A copy of the performance guarantee dated May 27, 2010 is hereto attached as EXHIBIT 3.  The subsidiary of Geden Holdings, and principal obligor, was a Maltese business entity- Avor Navigation, Ltd.

12.     At all times material hereto Geden Holdings had expressly warranted to Plaintiff that it was the ultimate beneficial owner of 11 oceangoing crude oil tanker vessels, (hereinafter collectively referred to as the "11 tankers") each of them respectively owned through a one-ship-company.  See document hereto attached as EXHIBIT 4.

13.     One of the 11 tankers owned by Geden Holdings through one of the 11 one ship-companies was the motor tanker "VALUE," a vessel with international identification number (IMO #) 9470131, which was owned by one-ship-company Value Shipping, Ltd.

14.     Part of the consideration recited in the performance guarantee of Geden Holdings was that in return for Plaintiff's forbearance from arresting any of the said vessels owned by the guarantor for the failure of its subsidiary to perform the obligations undertaken, the guarantor would render the performance promised under its guarantee.

---

[1] *See* case history in *Eclipse Liquidity, Inc. v. Geden Holdings Ltd.*, 2018 Pa. Super. LEXIS 1313; 2018 PA Super 332 | 2018 WL 6427186 (2018)

4

Avor Navigation Ltd. requiring of it to purchase the vessel AVOR. Avor Navigation Ltd. refused to honor Plaintiff's exercise of the option and Plaintiff commenced arbitration in London which decided the case in Plaintiff's favor, issuing its award on December 5, 2016.

16.     Avor Navigation Ltd. failed and refused to honor the arbitration award and Plaintiff made due demand on Geden Holdings for payment under its performance guarantee. Geden refused to honor its guarantee and Plaintiff pursued the matter in the High Court in the U.K. and obtained the judgment which was recognized in Pennsylvania.

## Geden Holdings' Restructuring of assets Ownership

17.     Unbeknownst to Plaintiff, Commencing in December of 2014 and throughout the following year, Geden Holdings Ltd. commenced implementing a plan whereby it transferred all 11 of the oil tankers which it owned, including the 'VALUE," to freshly-minted one-ship companies as shown in table I below:

**TABLE I**

| VSL FORMER NAME | FORMER OWNER | VSL NEW NAME | NEW OWNER |
|---|---|---|---|
| PROFIT | Profit Shipping, Ltd. | ADVANTAGE SOLAR | Advantage Solar Shipping, LLC |
| TARGET | Target Shipping, Ltd. | ADVANTAGE ARROW | Advantage Arrow Shipping, LLC |
| TRUE | True Shipping, Ltd. | ADVANTAGE AVENUE | Advantage Avenue Shipping, LLC |
| BLUE | Blue Shipping, Ltd. | ADVANTAGE SKY | Advantage Sky Shipping, LLC |
| PINK | Pink Shipping, Ltd. | ADVANTAGE SUMMER | Advantage Summer Shipping, LLC |
| BLANK | Blank Shipping, Ltd. | ADVANTAGE START | Advantage Start Shipping, LLC |
| REEF | Reef Shipping, Ltd. | ADVANTAGE SPRING | Advantage Spring Shipping, LLC |
| BRAVO | Bravo Shipping, Ltd. | ADVANTAGE ATOM | Advantage Atom Shipping, LLC |
| POWER | Barbaros Maritime, Ltd. | ADVANTAGE ANTHEM | Advantage Anthem Shipping, Ltd. |

Case ID: 200300816

| VALUE | Value Shipping, Ltd. | ADVANTAGE AWARD | Advantage Award Shipping, LLC |
| ROYAL | Prima Shipping, Ltd. | ADVANTAGE SUN | Advantage Sun Shipping, Ltd. |

18.    The result of the above transfers was that Geden Holdings was entirely stripped of its trading assets all of which were passed on to a new holding company – Advantage Tankers LLC.

19.    Neither Geden Holdings, nor Avor Navigation, nor any of the subsidiaries of Geden Holdings disclosed to Plaintiff the transfer of the 11 crude oil tankers owned by Geden Holdings through its wholly owned subsidiaries.

20.    As shown in the foregoing Table I , a part of the planned transfer of each one of the 11 crude oil tankers was its renaming, re-flagging,  and passing its ownership to new one-ship-companies.

21.    The transfer of the 11 crude oil tankers was done on the basis of a restructuring plan (hereinafter "the restructuring") conceived and executed by or on behalf of the ultimate beneficial owner of the 11 tankers, a Turkish individual named Mehmet Emin Karamehmet and/or members of his immediate family and trusted employees Ali Tugrul Tokgoz and Mehmet Mat.

22.    After restructuring, the legal ownership of the vessels noted in the foregoing Table I was changed and 85% thereof was transferred to one Gulsun Nazli Karamehmet Williams, the daughter and only child of Mehmet Emin Karamehmet.  The remaining 15% of the beneficial ownership was transferred to Ali Tugrul Tokgoz who was the Chief Executive Officer and a director of Geden Holdings Ltd. and became the Chief Executive Officer and a director of Advantage Tankers, LLC.  A diagrammatic representation of the restructured Geden Holdings Ltd. as Advantage Tankers, LLC is hereto attached as EXHIBIT 5.

6

23.     The stated objectives of the re-structuring plan was threefold:  to cut off the recourse of non-lending creditors such as Plaintiff against the assets of the guarantor; to ringfence these assets against claims of creditors; and to provide sufficient reassurance to lending creditors to refinance existing debt.   However, in actual fact, the ultimate beneficial ownership of the corporate entities which owned the above mentioned 11 tanker vessels remained unchanged as evidenced by the Letter of Consent and Appendix thereto (attached to this complaint as EXHIBIT 6), and the ultimate beneficial owner continued to be Mehmet Emin Karamehmet.

24.     Before restructuring Geden Holdings, Ltd, as shown in EXHIBIT 5 was part of a business enterprise structure which, is schematically represented in "Table II" below (hereinafter referred to as the "old structure":

**TABLE II**



25.     With reference to the structure shown in the preceding Table II:  "Karamehmet" refers to Mehmet Emin Karamehmet and members of his immediate family; "Buselten Finance, Panama"  refers to a Panamanian corporate entity entirely owned by Karamehmet which acts as a

Case ID: 200300816

business entity located in Turkey which is entirely owned by Mehmet Emin Karamehmet that controls a vast network of business enterprises, including Geden Lines.

26. Geden Lines is a trade name of a Turkish corporate ship management entity based in Istanbul, the full corporate name of which is Genel Denizcilik Nakliyati AS;[2] Geden Lines is the only entity of the group identified in the foregoing Table II which actively engages in the business of shipping including the operation, crewing, technical management; commercial management and administrative management of vessels as well as corporate entities. The other corporate entities identified in Table II are passive holding companies.

27. Once "restructuring" was implemented the holding structure of the respective vessels, as noted in the foregoing Table I, became as diagrammatically shown in Table III below (hereinafter referred to as "the new structure").

### TABLE III



---

[2] "Geden" derives from the first two and first three letters of the Turkish words Genel= General and Denizcilik= Maritime.

Case ID: 200300816

28.     Accordingly, the ownership of the 11 crude oil tankers which under the "old structure" was in Maltese Special Purpose Companies ("SPS's) entirely owned by Geden Holdings, Ltd. as shown in Table II, passed on to the ownership of Marshall Islands SPCs entirely owned by Advantage Tankers, LLC.  However, under both structures the operational, technical, commercial and administrative management of the vessels remained with Geden Lines.

29.     Though the Defendants commissioned professionals to work out an elaborate plan for the restructuring of the ownership of the vessels whereby the restructuring might be represented as a sale of the shipping assets of Geden Holdings to Advantage Tankers for fair market value, the actual restructuring as implemented by Defendants was an extra-judicial private fraudulent bankruptcy disguised as an arm's length sale transaction to the detriment of non-lending creditors.

### Advantage Award Shipping, LLC Specific Allegations

30.     Plaintiff repeats and realleges all matters set forth in the above and foregoing, and with specific reference to Defendant Award, LLC avers as follows.

31.     At all times material hereto the motor tanker "VALUE" a vessel with International Identification Number (IMO) 9470131 was held under the old structure by Value Shipping, Ltd., a Maltese corporate entity which, in turn, was 100% held by Geden Holdings.  As a result of "restructuring," the VALUE was renamed ADVANTAGE AWARD and was transferred to Advantage Award Shipping, LLC which is 100% held and controlled by Advantage Tankers, LLC. *See* Table I.

32.     At all times material hereto the President and CEO of Value Shipping Ltd. was Ali Tugrul Tokgoz; and its Chief Financial Officer was Mehmet Mat.  These individuals held the same positions in Geden Holdings Ltd, of which they are also directors.

33.     After restructuring, Tugrul Tokgoz became the CEO of Advantage Award Shipping, LLC and Mehmet Mat became its CFO.  At the same time the same individuals also

Case ID: 200300816

34. The tanker ADVANTAGE AWARD, after restructuring, continued to be employed under long-term time charter by Shell Western Supply & Trading, of Barbados, as it was before the restructuring under her former registered ownership by Value Shipping, Ltd.

35. As part of the restructuring the vessel ADVANTAGE AWARD under ship management contract with Geden Lines continues to be managed by the said company as she had been managed before restructuring under her former name VALUE. Geden Lines is responsible for the technical, commercial, crewing, and administrative management of the ADVANTAGE AWARD in the same manner as it was before the restructuring.

36. As part of the Defendants' restructuring plan the VALUE, now renamed ADVANTAGE AWARD, was refinanced by the same financial institution that had provided the original financing for its acquisition, i.e. UniCredit Bank, A.G.

37. As a result and as part of restructuring, Advantage Award Shipping, LLC became one of 11 "newcos" that were purposely established by Geden Holdings for the purpose of serving as receptacles for the legal ownership of the assets formerly held by Geden Holdings, i.e. as legal owners of the respective 11 tankers as shown in Table I.

38. As a result and by virtue of the unlawful restructuring that Defendants masqueraded as an arm's length sale, Value Shipping Ltd. became inactive and disengaged from the business while Advantage Award Shipping, LLC took over and is performing the same business of time chartering the same vessel to Shell Western Supply.

39. Notwithstanding the purported sale of the ADVANTAGE AWARD by Value Shipping, Ltd and its purported purchase by Advantage Award Shipping, LLC, Geden Holdings, which was the beneficiary of the purported sale and should have received the part of the sale proceeds representing its equity in the ADVANTAGE AWARD, is unable or unwilling to account

10

Holdings is unable or unwilling to account for the receipt and disposal of the sale proceeds from the purported sale of the other 10 of the 11 tankers.

40.     Notwithstanding the purported sale of the vessel to Advantage Award Shipping LLC the commercial, technical, and administrative management and control of the vessels noted in Table I, including the VALUE renamed ADVANTAGE AWARD remained and continues to be with Geden Lines, in return for substantial management fees Geden Lines receives from Award LLC. Geden Lines is 100% controlled by Mehmet Emin Karamehmet and has as its Chief Executive Officer Tugrul Tokgoz and Mehmet Mat as its Chief Financial Officer.

41.     At all times material hereto, the actual day-to-day operations of the ADVANTAGE AWARD was and continues to be performed by Geden Lines irrespective of the purported sale of the vessels as shown in the foregoing Table I.

42.     At all times material hereto, after restructuring, the ultimate beneficial ownership and control of the ADVANTAGE AWARD remains with the same shareholders who owned and controlled same before restructuring, as confirmed by Geden in its Consent Letter hereinabove referred to and attached to this Complaint as EXHIBIT 6.

43.     At all times material hereto after restructuring the ultimate legal ownership and control of the ADVANTAGE AWARD and Advantage Award Shipping, LLC remain with persons who are members of the Karamehmet family, and more specifically his daughter and only child Gulsun Nazli Karamehmet Williams.

44.     At all times material hereto, after restructuring, Mehmet Emin Karamehmet as controlling shareholder of Geden Lines maintains a substantial economic interest in the ADVANTAGE AWARD as Geden Lines, which Emin Karamehmet owns, derives substantial economic benefit from its contractual role as technical, administrative, and commercial manager and operator of the ADVANTAGE AWARD.

11

at all times material hereto all of the obligations and liabilities incident to the ownership and operation of the ADVANTAGE AWARD that were formerly performed by Geden Holdings Ltd. have been taken over and are being performed by Advantage Tankers and Advantage Award Shipping, LLC. These include entering into contracts in the form of time charter parties with major oil companies, employing seafarers to operate vessels, providing contractual undertakings, and granting performance guarantees to creditors who provide the financing of the vessels that it holds through its one-ship-company wholly owned subsidiaries.

46. At all times material hereto, following restructuring, all of the business formerly carried on by Geden Holdings on behalf of Value Shipping Ltd. continue to be performed by Advantage Tankers on behalf of Advantage Award Shipping LLC in such a manner and to such an extent that, except for the name change, the two entities are indistinguishable including the following particulars: both corporate entities have the same Chief Executive Officer Tugrul Tokgoz and Chief Financial Officer Mehmet Mat; both companies have the same business address in Istanbul, Turkey; both have carried on the same business with the same business counterparties; both have carried on the same business with the same vessel - employing the same personnel, and operating from the same business address in Istanbul, Turkey.

## COUNT I

### Advantage Award Shipping, Ltd. and Advantage Tankers are liable to Plaintiff as successor corporations of Geden Holdings, Ltd.

47. Plaintiff repeats and realleges the foregoing ¶¶ 1-46 and as Count I of its claim against Defendants further avers and pleads that Advantage Award Shipping LLC is a mere continuation of Value Shipping Ltd. and of Geden Holdings, or the result of a de facto merger with the said entities.

48. In actual fact the "sale" of the shipping assets of Geden Holdings, to Advantage Tankers-controlled one-ship-companies, as shown in foregoing Table I, was not a straightforward market sale of assets but a planned transfer to successor corporations purposely and by design

12

created by Karamehmet's trusted employees and associates Tugrul Tokgoz and Mehmet Mat who were at the same time officers and directors of Geden Holdings and Geden Lines, and also became respectively, the Chief Executive Officer and Chief Financial Officer of the buyer of Geden Holding's assets - Advantage Tankers, LLC. The purpose of Advantage Tankers was to take over and continue the business of Geden Holdings for the same interests, and to render Geden Holdings inactive in the business; judgment-proof; and incapable of responding to claims of non-bank creditors.

49.     At all times material hereto, notwithstanding "restructuring", the commercial, technical, and administrative management and control of the vessels noted in Table I remained and continues to be with Geden Lines in return for the substantial fees Geden Lines receives from the respective one-ship- companies that own the vessels. Geden Lines is 100% controlled by Mehmet Emin Karamaehmet and has as its Chief Executive Officer Tugrul Tokgoz and as its Chief Financial Officer Mehmet Mat.

50.   At all times material hereto, the actual day to day operations of the vessels was and continues to be performed by Geden Lines irrespective of the purported sale and nominal change of ownership as shown in the foregoing Table I.

51.     At all times material hereto, the employment of the 11 tankers vessels into long-term time charter after the sale was and remains with the same time charterer who employed the vessels before the sale. i.e. Shell Western Supply & Trading Ltd. of Barbados.

52.     At all times material hereto, after restructuring, the ultimate beneficial ownership and control of the 11 tankers remains with the same shareholders who owned and controlled them before restructuring as confirmed by Geden Holdings in its Consent Letter hereinabove referred to and attached to this Complaint as EXHIBIT 6.

Case ID: 200300816

At all times material hereto, after restructuring, the ultimate beneficial ownership and control of the vessels and the respective SPC's which are their legal owners, remains with persons who are members of the Karamehmet family, and more specifically Mehmet Emin Karamehmet and his daughter and only child Gulsun Nazli Karamehmet Williams.

54.    At all times material hereto, after restructuring, Mehmet Emin Karamehmet as controlling shareholder of Geden Lines maintains a substantial economic interest in the 11 tankers through his 100% ownership of Geden Lines, which is the contractual technical, administrative, and commercial manager and operator of the said vessels which are nominally controlled by Advantage Tankers.

55.    By contrast Geden Holdings has ceased carrying on business, and it proclaims that it has no assets, no funds, and that it has become an empty shell.

56.    At all times material hereto all of the obligations and liabilities incident to the ownership and operation of the 11 tankers that were formerly performed by Geden Holdings Ltd. have been taken over and are being performed by Advantage Tankers. These include entering into contracts in the form of time charter parties with major oil companies, employing seafarers to operate vessels; providing contractual undertakings and performance guarantees to creditors who provide the financing of the vessels that it controls as the legal owner or their respective one-ship corporate owners, on whose behalf it enters into financing and refinancing arrangements.

57.    At all times material hereto, following restructuring, all of the business formerly carried on by Geden Holdings continues to be performed by Advantage Tankers in such a manner and to such an extent that, except for the name change the two entities are indistinguishable, including the following particulars: both corporate entities have the same Chief Executive Officer -Tugrul Tokgoz - and Chief Financial Officer - Mehmet Mat; both entities have the same business address in Istanbul, Turkey; both entities have carried and are carrying on the same business with the same business counterparties; both entities have carried on the same business with the same

14

Lines; both entities in carrying on business employ the same shore-side personnel.

58.     In carrying on business as successor corporation of Geden Holdings, Advantage

Tankers employs the 11 corporate entities to which ownership of the 11 tankers was transferred

including defendant Advantage Award Shipping, LLC as shown in Table I.

59.     In consequence of the foregoing, Advantage Tankers, LLC is a mere continuation

of Geden Holdings, Ltd. or the result of a de facto merger of the two entities.

## COUNT II

**The Corporate veil of Defendants Advantage Tankers and Advantage Award LLC should be pierced as it is employed abusively to commit fraud or other injustice to the detriment of Geden Holdings' creditors.**

60.     Plaintiff repeats and realleges ¶¶ 1-59 of the above and foregoing Complaint and

for its further and additional claim against Defendants avers and pleads as follows.

61.     At all times material hereto Geden Holdings Ltd. acting by and through its own

officers and directors and at the express direction of its ultimate beneficial owners devised and

established a fraudulent restructuring scheme.   It caused the incorporation of a new group of

limited liability companies consisting of  Advantage Tankers and 11 associated subsidiaries,

including Advantage Award Shipping, LLC  which were to become  the future buyers of  the

vessels  that Geden Holdings Ltd. was holding in order to insulate them from the reach of creditors

to whom Geden Holdings was indebted.

62.     As part of its restructuring and transmutation into Advantage Tankers, Geden

Holdings made arrangements with several of the banks that were its lenders to refinance the vessels

by making new loan agreements with these "newcos," the putative one-ship-company buyers that

acquired the vessels from their predecessor corporate entities as shown in Table I. Thus, Geden

made the arrangements with UniCredit Bank, A.G for the acquisition of the VALUE by Advantage

Award Shipping LLC.

15

Through such arrangements Geden Holdings Ltd. drained all of its assets deliberately making itself undercapitalized and reduced itself from an asset-rich company to an assetless sham, incapable of performing the obligations it had undertaken.

64. Though purporting to have sold its equity interest in the 11 crude oil tankers to Advantage Tankers for approximately USD 200,000,000 Geden Holdings, notwithstanding several demands of Plaintiff to pay the outstanding judgment is failing and refusing to honor same and at the same time it is unable or unwilling to disclose how it disposed of the proceeds of the purported sale.

65. Geden Holdings, as a judgment debtor, in response to Plaintiff's discovery in aid of execution of the judgment in Pennsylvania, has failed and refused to produce its accounting records that should record and disclose how these purported sale proceeds were received by Geden and how they were disposed / disbursed.

66. In consequence whereof Geden Holdings Ltd. has failed to comply with the basic corporate formalities of maintaining truthful and accurate business and accounting records.

67. By means of the arrangements for restructuring of the ownership of the assets of Geden Holdings, Ltd. and the purported sale of these to Advantage Tankers, the said corporate entities were used by their ultimate beneficial owners, to wit Mehmet Emin Karamehmet and Gulsun Nazli Karamehmet Williams to defraud Plaintiff by shifting the assets of Plaintiff's obligor Geden Holdings Ltd, to purportedly separate corporate entities under the guise lawful arm's length transactions.

68. The "restructuring" of the ownership of the assets of Geden Holdings was knowing, deliberate, and intentional as the purported corporate "buyers" of the vessels, Advantage Tankers along with its subsidiary one-ship-companies were corporate creatures organized by the management of Geden Holdings for the express purpose of taking over the business of Geden

Case ID: 200300816

ownership of the Karamehmet interests in the vessels.

69. The restructuring plan of Geden Holdings expressly contemplated insulating the shipping assets (vessels) of the said debtor Geden Holdings from arrest and/or attachment and ringfencing them from the just demands of its creditors, by changing their registered ownership and misrepresenting the restructuring as an arm's length sale based on a sophisticated plan worked out by professional restructuring experts.

70. In consequence of the foregoing, the corporate form of the Defendants was used by their ultimate beneficial owners, their agents, servants and employees to perpetrate a fraud, to wit to induce Plaintiff to contract with subsidiaries of Geden the performance of which Geden had guaranteed, not intending to perform its guarantor obligations; and transferring its assets to the "newco" Advantage Tankers, beyond the reach of Plaintiff as a creditor.

71. At all times material hereto Defendants failed to maintain adequate corporate records including records in the following categories: records of correspondence bearing on or relating to the restructuring and reorganization of ownership; internal correspondence with the beneficial and ultimate beneficial shareholders of the entities that owned the vessels; records of contracts and agreements with bankers for the refinancing of the vessels; records of financial transactions showing receipt of funds by the one ship companies of the Geden Group that purportedly sold the 11 crude oil tankers; bank account statements verifying money transfers in and out; statement of accounts showing receipts and expenditures; documents reflecting internal contractual arrangements for the adjustment of trading debt as between the buyers and the purchaser of the tankers. The complete absence of corporate records with bearing upon multimillion-dollar transactions suggests that the purported transfer of assets from Geden to Advantage Tankers was not genuine but fictitious and part of a scheme to defraud creditors.

17

COUNT III

The transfer of assets of Geden Holdings to Advantage Award Shipping, LLC is fraudulent under the Pennsylvania Uniform Fraudulent Transfer Act

72. Plaintiff repeats and realleges ¶¶ 1-71 of the above and foregoing Complaint and for its further and additional claim against Defendants under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA") avers and pleads as follows.

73. At all times material hereto Plaintiff's cause under this section of its Complaint arose from actions that preceded the 2018 enactment of the Pennsylvania Uniform Voidable Transactions Act and, consequently, Plaintiff's claims under this Count are governed by PUFTA.

74. At all times material hereto Plaintiff was a creditor of Defendant Geden Holdings in that Plaintiff had a claim against Geden Holdings arising from Geden Holdings' letter of Guarantee dated May 27, 2010 and from the performance failure of Geden's wholly owned subsidiary Avor Navigation, Limited.

75. At all times material hereto the following persons were respectively insiders of Geden Holdings, Ltd. and /or Advantage Tankers and/or Advantage Award Shipping, LLC:

(a) Tugrul Tokgoz, by virtue of his roles as director of Geden Holdings; Officer and Director of Advantage Tankers, and officer and director of Advantage Award LLC;

(b) Mehmet Mat, by virtue of and in his capacity as Chief Financial officer of Geden; Chief Financial Officer of Advantage Tankers; Chief Financial Officer of Advantage Award LLC;

(c) Mehmet Emin Karamehmet, as the controlling shareholder through intermediary holding companies of the debtor Geden Holdings.

(d) Gulsun Nazli Karamehmet Williams as a close relative of Mehmet Emin Karamehmet, - his only child and daughter- and 85% legal owner of Advantage Tankers, LLC.

76. At all times material hereto the transfer of the ownership of the vessel VALUE, renamed after the transfer "ADVANTAGE AWARD", by the transferee Advantage Award Shipping LLC. and its parent corporation Advantage Tankers LLC, was made under and by virtue

18

of the "restructuring" plan, as averred, in the foregoing for the express purpose, - acknowledged by Geden Holdings in its restructuring plan - of making the transferor (seller) Geden Holdings essentially judgment proof and incapable of responding in damages to Plaintiff's claims.

77.    At all times material hereto Geden Holdings arranged and effected the transfer of the 11 crude oil tankers to Advantage Tankers as noted in the forgoing for the express purpose of putting the said assets into the legal ownership of business entities which it caused to be established in order to ringfence and insulate same from the reach of its creditors, including Plaintiff.

78.    The said Defendant's intent in this regard is evidenced by reference to the following facts: (1) The transfer of the property was to Mehmet Emin Karamehmet's only child Gulsun Nazli Karamehmet Williams, who is an insider under PUFTA;  (2) As it is averred in the foregoing, the ultimate beneficial shareholder of debtor Geden Holdings retained possession and / or control by virtue of Mehmet Emin Karamehmet's continued control over the "new" owners of each and every one-ship-company to which the respective vessels were transferred as shown in the attached EXHIBIT 6;  (3) The transfer of the property, viz the MT VALUE and every vessel formerly held through the one-ship-companies controlled by Geden Holdings was carried on without any notice to Plaintiff, even though Plaintiff was at all times material hereto the beneficiary of Geden Holdings' guarantee; (4) Preceding the massive transfer of all of its assets, including that of the 'VALUE'' which was renamed "ADVANTAGE AWARD" repeated demands were made by Plaintiff on Geden Holdings to purchase the vessel AVOR as it had undertaken through its subsidiary Avor Navigation, Ltd. and Plaintiff had threatened legal action;  (5) The transfer of the 11 crude oil tankers by Geden Holdings to Advantage Tankers amounted to a transfer of all fixed assets which were owned by the former;  (6) Contrary to the representations to its non-lending creditors, the single controlling shareholder of Geden Lines, Mehet Emin Karamehmet retained ownership and control over the property purportedly transferred,  viz. the 11 crude oil carriers shown at Table I (see EXHIBIT 6) ; (7) On information and belief the sale of the 11 crude

carrier tankers to Advantage Tankers was not an arm's length market sale transaction but part of
an elaborate design to disguising fraudulent transfers as genuine commercial sales;  (8) Virtually
upon completion of the transfer of the 11 crude tankers to Advantage Tankers Defendant, Geden
Holdings became insolvent and ceased to carry on business.

79.    At all times material hereto Geden Holdings arranged and effected the transfer of
the 11 crude oil tankers to Advantage Tankers as noted in the forgoing for the express purpose of
putting the said assets into the legal ownership of  business entities appearing to be controlled by
third parties which it caused to be established in order to ringfence and insulate these assets from
its creditors' reach.

80.    In consequence of the foregoing, Plaintiff respectfully prays that the Court make
appropriate orders, as necessary so that the transfer of the vessel ADVANTAGE AWARD by
Defendant Geden Holdings Ltd. to Advantage Tankers, LLC and/or to Advantage Award
Shipping, LLC.  be declared fraudulent as to Plaintiff, and avoidable.

81.    In accordance with the provisions of PUFTA, and as Plaintiff has already obtained
a judgment against Geden Holdings Ltd. Plaintiff respectfully prays for an order of execution
against the M/T ADVANTAGE AWARD and any right, claim or   interest whatsoever that
Advantage Tankers LLC, Advantage Award Shipping, LLC may have in the Advantage Award
either as owners of  the said vessel, or bareboat charterers of the said vessel, or participants in any
joint ownership arrangement over the said vessel, including any limited liability company interest;
and over any earnings from the commercial employment of the vessel .

### PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests that process in due form of law issue against
Defendants  Geden Holdings, Advantage Tankers, and Advantage Award Shipping LLC ordering
them to appear in the proceedings herewith commenced; and after due proceedings are had and
this cause is adjudicated the Court make a finding that Defendants Advantage Award Shipping,

20

for the judgment Plaintiff holds in the sum of $3,479,152.69 together with interest and costs; and in addition, or in the alternative that the corporate veil of Geden Holding should be pierced and that Defendants Advantage Award Shipping, LLC and Advantage Tankers should be adjudged liable to Plaintiff in respect of the said judgment; and in addition or in the alternative, the Court, make an order that that the transfer of the motor tanker ADVANTAGE AWARD (ex - VALUE) to Defendant Advantage Award Shipping, LLC is fraudulent and void as to Plaintiff and issue an order of execution against the M/T ADVANTAGE AWARD and any right, claim or interest whatsoever that Advantage Tankers LLC, Advantage Award Shipping , LLC may have in the said vessel either as owners of the said vessel or as her bareboat charterers, or participants in any joint ownership arrangement over the said vessel, including any limited liability company interest in business entities which are or purport to be said vessel's registered owners; and over any earnings from the commercial employment of the vessel; and the Court adjudge that the Defendants and each of them are liable to Plaintiff for the sum of $3,479,152.69, together with interest and costs; and for such other and further relief that the Court deems just, equitable and proper.

Dated: March ___, 2020

Respectfully Submitted,

REEVES MCEWING, LLP

By: /s/ Michael F. Schleigh, Esq.
Michael F. Schleigh, Esq.
Mary Elisa Reeves, Esq.
PA Id No. 44194/88407
1004 Front Street
Philadelphia, PA 19147
Telephone: 267-324-3773
E-mail: reeves@lawofsea.com

Case ID: 200300816

COMMONWEALTH OF PENNSYLVANIA

DEPARTMENT OF STATE

08/26/2016

Filed and Attested by the
Office of Judicial Records
06 MAR 2020 04:56 pm
E.PILGRINI

## TO ALL WHOM THESE PRESENTS SHALL COME, GREETING:

I DO HEREBY CERTIFY THAT,

Geden Holdings Ltd.

is duly registered to do business under the laws of the Commonwealth of Pennsylvania and remains a registered Foreign Business Corporation so far as the records of this office show, as of the date herein.

I DO FURTHER CERTIFY THAT this Certificate of Registration shall not imply that all fees, taxes and penalties owed to the Commonwealth of Pennsylvania are paid.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Seal of the Secretary's Office to be affixed, the day and year above written

*Pedro A. Cortés*

Secretary of the Commonwealth

Certification Number: TSC160826140965-1

Verify this certificate online at http://www.corporations.pa.gov/orders/verify.aspx

Case ID: 200300816



**Commonwealth of Pennsylvania**
**Bureau of Corporations and Charitable Organizations**
401 North street,Room 206,P.O.Box 8722
Harrisburg,PA  17105-8722
(717)787-1057
www.dos.state.pa.us/corps



Filed and Attested by the
Office of Judicial Records
06 MAR 2020 04:36 pm
BILIGRINI

## Entity Report

August 26,2016

Examination of the indices in the Department of State on the above date show a
Business Corporation  was filed on December 15,2014 entitled:

**Geden Holdings Ltd.**

Enity #    4317664

Citizenship:   Foreign

With Address At:      % Ct Corporation System ,  ,PA,

**Filing History :**

| Date | Microfilm | Filing |
|------|-----------|--------|
| 12/15/2014 | | Creation Filing |
| 12/22/2014 | | Change of Address |

Entity #: 4317884
Date Filed: 12/22/2014
Carol Aichele
Secretary of the Commonwealth

[Print Form]

Filed and Attested by the
Office of Judicial Records
06 MAR 2020 04:36 pm
A. SILIGRINI

**PENNSYLVANIA DEPARTMENT OF STATE**
**BUREAU OF CORPORATIONS AND CHARITABLE ORGANIZATIONS**

Statement or Certificate of Change of Registered Office (15 Pa.C.S.) for
(check one):

_____ Domestic Business Corporation (§ 1507)
__X__ Foreign Business Corporation (§ 4144)
_____ Domestic Nonprofit Corporation (§ 5507)
_____ Foreign Nonprofit Corporation (§ 6144)
_____ Domestic Limited Partnership (§ 8506)
_____ Domestic Limited Liability Company (§ 8906)

Name  **CT - COUNTER**

Address

City  9376011 SO 33

State     Zip Code

Document will be returned to the name and
address you enter to the left.

Commonwealth of Pennsylvania
FOREIGN BUSINESS CHANGE OF REGISTERED OFFICE 2 Page(s)

Fee: $5

T1436460138

In compliance with the requirements of the applicable provisions of 15 Pa.C.S. (relating to change of registered office), the undersigned corporation, limited partnership or limited liability company, desiring to effect a change of registered office, hereby states that:

1. The name is:

   Gatien Holdings Ltd.

2. Current address as registered with the Department of State. *Complete part (a) or (b) – not both:*

   (a) The address of its current registered office in this Commonwealth is:

   | Number and street | City | State | Zip | County |
   |---|---|---|---|---|

   (b) The name of its current commercial registered office provider and the county of venue is:

   c/o: CT Corporation System                                               Dauphin
   Name of Commercial Registered Office Provider                    County

3. New address. *Complete part (a) or (b) – not both.*

   (a) The address in this Commonwealth to which the registered office of the corporation, limited partnership or limited liability company is to be changed is:

   | Number and street | City | State | Zip | County |
   |---|---|---|---|---|

   (b) The registered office of the corporation, limited partnership or limited liability company shall be provided by:

   c/o: CT Corporation System                                               Philadelphia
   Name of Commercial Registered Office Provider                    County

Revised 8/2013

2014 DEC 22 PM 1:40
PA DEPT. OF STATE

Case ID: 200300816

DSCB:15-1507/4144/5507/6144/8506/8906-2

4. *For corporations only:*

   Such change was authorized by the Board of Directors of the corporation.

IN TESTIMONY WHEREOF, the undersigned has caused
this Statement or Certificate of Change of Registered
Office to be signed by a duly authorized officer, general
partner, member or manager thereof this

19th day of December, 2014

GEDEN HOLDINGS LTD
Name of Corporation/Limited Partnership/
Limited Liability Company

_____
Signature

DIRECTOR
Title

Revised 8/2013

Entity# : 6502974
Date Filed : 01/30/2017
Pedro A. Cortés
Secretary of the Commonwealth

Filed and Attested by the
Office of Judicial Records
06 MAR 2020 04:36 pm
E. PILEGRINI

PENNSYLVANIA DEPARTMENT OF STATE
BUREAU OF CORPORATIONS AND CHARITABLE ORGANIZATIONS

**PENNCORP
SERVICEGROUP** 44680

**COUNTER PICK-UP**

Foreign Registration Statement
DSCB:15-412

☒ Return document by email to:   penncorp@penncorp

TCO170130JF0853

Read all instructions prior to completing. This form may

Fee: $250

In compliance with the requirements of the applicable provisions of 15 Pa.C.S. § 412 (relating to foreign registration statement), the undersigned foreign association hereby states that:

1. The type of association is (check only one):

☐ Business Corporation
☐ Nonprofit Corporation
☒ Limited Liability Company

☐ Limited Partnership
☐ Limited Liability (General) Partnership
☐ Limited Liability Limited Partnership

☐ Business Trust
☐ Professional Association

2. The full and proper name of the foreign association as registered in its jurisdiction of formation is:

Advantage Award Shipping LLC

2A. If the name in 2 does not contain a required designator or if the name in 2 is not available for use in the Commonwealth, the alternate name under which the association is registering in this Commonwealth is:

A resolution of the governors adopting the name in 2A for use in registering to do business in this Commonwealth must be attached.

3. The jurisdiction of formation is: Republic of the Marshall Islands

4. The street and mailing address of the association's principal office.

| Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro | | MH | 96960 |
|---|---|---|---|
| Number and street | City | State | Zip |

4A. The street and mailing address of the office, if any, required to be maintained by the law of the association's jurisdiction of formation in that jurisdiction:

| Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro | | MH | 96960 |
|---|---|---|---|
| Number and street | City | State | Zip |

PAGE - 39/2015/Walen Gluver Obbie:

2017 JAN 30 AM 9: 50

DSCB:15-412 - 2

**5.** The (a) address of the association's proposed registered office in this Commonwealth or (b) name of its Commercial Registered Office Provider and the county of venue is:

*Complete part (a) OR (b) – not both:*

(a) _____
Number and street                    City          OR          State        Zip        County

(b) c/o: Seville Inc.,
Name of Commercial Registered Office Provider                                                      Philadelphia
County

**6.** *Check one of the following:*
- ☒ The association may not have series.
- ☐ The association may have one or more series.

**7.** *Effective date of registration of foreign association (check, and if appropriate complete, one of the following):*
- ☒ The Foreign Registration Statement shall be effective upon filing in the Department of State.
- ☐ The Foreign Registration Statement shall be effective on: _____ at _____
   Date (MM/DD/YYYY)                     Hour (if any)

**8.** *To be completed by Limited Liability Companies only. Check, and if appropriate complete, one of the following:*
- ☒ The association is a limited liability company which is not organized to render any of the below professional service(s).

- ☐ The association is a restricted professional limited liability company organized to render one or more of the following professional service(s): (If this box is checked, one or more of the fields below must be checked.)

| | | |
|---|---|---|
| ___ Chiropractic | ___ Dentistry | ___ Law |
| ___ Optometry | ___ Osteopathic medicine and surgery | ___ Podiatric medicine |
| ___ Psychology | ___ Veterinary medicine | |

___ Medicine and surgery
___ Public accounting

IN TESTIMONY WHEREOF, the undersigned association has caused this Foreign Registration Statement to be signed by a duly authorized representative thereof this **27 th** day of **JANUARY** , 20**17** .

ADVANTAGE AWARD SHIPPING LLC
Name of Association

_____
Signature

MEHMET MAT / CFO
Title

PA028 - 8/4/2015 Wolters Kluwer Online

Case ID: 200300816

# GEDEN HOLDINGS LTD.

### 85 St.John's Street , Valletta . Malta
#### Tel: 0090 212 319 51 00 – Fax : 0090 212 325 58 14

Filed and Attested by the
Office of Judicial Records
06 MAR 2020 04:32 pm
A. SHERIKIN

Messrs.
Eclipse Liquidity Inc.
Marshall Island

## IRREVOCABLE PERFORMANCE GUARANTEE

In consideration of you, Eclipse Liquidity Inc. / Marshall Island (hereinafter the "Company" ), entering into a Bareboat Charterparty as per rider clause 13 of "BARECON 2001" dated 27 May 2010 and any and all subsequent addenda thereto (the "Contract") with Avor Navigation Ltd / Malta (the "Charterer") as charterer and or buyer, we, subject to the provision of the paragraphs below, Geden Holdings Ltd of Malta hereby unconditionally and irrevocably guarantee as primary obligor on first demand the full and timely performance by the Charterer of all its obligations under the Contract, including, but not limited to, the punctual payment of the hire and or the purchase price of the vessel MT AVOR, providing the Charterer with sufficient funds to fulfill the Contract, due and punctual payment to you of all amounts (if any) owing by the Charterer under or pursuant to the Contract.

Upon receipt your first written demand stating (i) that the claimed amount is due to you and remains unpaid for a period of seven (7) calendar days from the due date and (ii) copies of the hire statement for the relevant period, we especially undertake to make any payment which was due to you under the above-mentioned Contract but has not been paid on the due date by the Charterers to you to your account as specified in the Contract. Such demand is to specify the amount overdue and the date it was due.

A further consideration of the provision of this guarantee is your undertaking, confirmed by your countersignature hereunder, that subject to our payment of any overdue amount under this guarantee within 7 days of receipt of your demand, you will not execute your right of withdrawal of the Vessel as per the

Contract and you will refrain from arresting or otherwise detaining any of our assets.

However, in the event of any dispute between you and the Charterer in relation to:

(1) whether the Charterers shall be liable to pay the sum to you and;

(2) consequently whether you shall have the right to demand payment from us;

and such dispute shall have been submitted either by the Charterers or by you to Arbitration in accordance with clause 30 part II of the Contract within seven (7) calendar days from the Charterers' receipt of your demand for repayment, then we shall be entitled to withhold and defer payment until the awards is published. We shall not be obligated to make any payment to you unless the judgment orders the Charterers to make repayment. If the Charterers fail to honor the judgment within seven (7) days after that the final judgment had been rendered in the proceedings then we shall pay to you to the extent the judgment orders.

Any compliance with a demand hereunder shall be under strict reservation of, and shall not constitute a waiver of, our and the Charterer's rights in Contract and in Law.

No amendments, additions or variations to or extensions of the Contract, nor the granting of any additional time or other forbearance to the Nominee by you, nor any act or omission by you, shall release us from liability under the terms of this guarantee.

This Guarantee shall come into full force and effect upon the delivery of the same to you and shall continue in force and effect from the time when the charter period commences for a period of (7) seven years plus an additional period of further 12 months, in the case that the first option is declared by the Charterers in accordance with Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the second option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the third option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract. Notwithstanding the provisions hereinabove, in case we receive notification from you or from the Charterers stating that a claim covered by this Guarantee has been disputed and referred to Arbitration in accordance with the provisions of the Contract the period of validity of this Guarantee shall be extended until thirty (30) days after the final judgment shall be rendered in the proceedings. In such case, this Guarantee shall not be available unless and until such certified copy of the final awards in the Arbitration justifying your claim is

presented to us or a written agreement between the parties terminating the dispute is presented to us.

When this Guarantee shall have expired as aforesaid, you will return the same to us immediately without any request or demand from us, but non-return shall not affect the expiry of our commitment hereunder.

This guarantee shall be governed by and construed in accordance with the laws of England and we agree to submit to the non-exclusive jurisdiction of the English High Court.

The address and full style details of the Guarantor are as follows:

Mailing address:
GEDEN HOLDINGS LTD
C/O
BUYUKDERE CADDESI
YAPI KREDI PLAZA A BLOK K-12
LEVENT-ISTANBUL-TURKIYE

E-mail address:
chartering@gedenlines.com
Tel. +90 212 319 51 00 Fax +90 212 283 1604

27, May, 2010                        GEDEN HOLDINGS LTD of MALTA

Countersigned:
27, May, 2010                        AVOR NAVIGATION LTD of MALTA

# GEDEN HOLDINGS LTD.

85 St.John's Street , Valletta . Malta
Tel: 0090 212 319 51 00 – Fax : 0090 212 325 58 10

Filed and Atte    d by the
Office of Judicial Records
06 MAR 2020 04:36 pm
A. SILIGRINI

Messrs.
PSARA ENERGY LIMITED
Ajeltake Road, Ajeltake Island
Majuro, MH 96960
Marshall Island

04. March. 2010

We hereby confirm that Geden Holdings Ltd., Malta is the Holding Company for
all single purpose companies which owns one vessel each. The borrowers for the
bank loans are SPCs, not Geden Holdings Ltd., Malta. Geden Holdings Ltd.,
Malta is the guarantor for the bank loans.

GEDEN HOLDINGS LTD of MALTA

**CONSENT LETTER**

Filed and Attested by the
Office Of Judicial Records
06 MAR 2020 04:36 pm
E. GIURINI

From:   Geden Holdings Ltd (the "Shareholder")
        85 St.John's Street, Valletta, Malta

To:     Shell Western Supply and Trading Limited (the "Charterer")
        Barbados

06.02. 2015

Dear Sirs

1   We refer to the time charter parties each dated 13 March 2012 (in the case of the vessel "Royal", dated 17 October 2012) (the "Existing Charters") and entered into between the companies listed in Annex 1 hereto as owners (the "Existing Owners") and the Charterer in respect of the vessels listed in Annex 1 hereto (the "Vessels").

2   As part of certain reorganisation efforts being conducted by the existing shareholders of each Existing Owner, it has been proposed that each Existing Owner will sell (the "Vessel Sales") all its title, interest to and right in its Vessel to the relevant companies listed in Annex 1 here to as new owners (and each wholly owned by the Shareholder, the "New Owners").

3   Upon each Vessel Sale:

    (a)   the relevant Existing Owner will delete that Vessel from Maltese flag and the relevant New Owner will register that Vessel in its name under Marshall Islands flag;

    (b)   the relevant ship mortgage over that Vessel registered in the name of the banks and financial institutions listed in Annex 1 hereto as Existing Mortgagees shall be discharged and shall be replaced (as part of the financing and/or refinancing arrangements between that New Owner and its financiers) with a new ship mortgage s to be registered in the name of the banks and financial institutions listed in Annex 1 hereto as New Mortgagees;

    (c)   subject to the respective New Owners being acceptable to Charterer following Charterer's KYC and other relevant checks, the Existing Charters will be terminated by mutual agreement between the respective Existing Owners and Charterer and new charters (the "New Charters") will be entered into between the Charterer and the relevant New Owner on terms, inter alia, as follows:

          (i)    each New Charter shall come into effect on the time on which the relevant Vessel is delivered to, and accepted by, the relevant New Owner from the relevant Existing Owner pursuant to that Vessel Sale (the "Vessel Sale Effective Dates");

          (ii)   the duration of each New Charter shall be 5 years from the Vessel Sale Effective Date plus the optional period (3 years for aframaxes and 1 year for suezmaxes);

          (iii)  the charter hire (the "Hire") will be the aggregate of a base rate and profit sharing amount (the "PSA"). The Base Rate payable by the Charterer to the relevant New Owner shall be US$17,500 per day other than the vessels Advantage Sun, Advantage Sky, Advantage Solar, Advantage Start whereas the base rate shall be US$18,500 during the initial period of 24 months (the "Base Rate"). The PSA will be calculated as the monthly averages of certain trading routes as described in the relevant charter parties.

54142064v2

D01248

(iv) the terms of each New Charter shall otherwise be substantially the same as the terms of its corresponding Existing Charter, save as contemplated by this paragraph 3(c) and for logical amendments.

4    A pro-forma of New Charter is annexed to this Letter as Annex 2.

5    The Shareholder confirms to the Charterer that:

(a) it shall procure that an opinion on matters of Maltese law relating to the Title Transfers is given from Fenech & Fenech to the Charterer, in form and substance reasonably satisfactory to the Charterer, within 30 days from the date of this Letter;

(b) it shall provide to the Charterer promptly on reasonable request such information regarding the New Owners as the Charterer requires for KYC purposes.

6    The Shareholder hereby:

(a) notifies the Charterer of its intention to complete the Vessel Sales;

(b) confirms that it shall be keep the Charterer (i) updated of the intended dates  and schedule for the completion of each Vessel Sale and (ii) notified on the date on which each Vessel Sale is completed; and

(c) requests that the Charterer consents to the termination of the Existing Charters and entry into the New Charters (substantially on the terms above), each to come into effect on the relevant Vessel Sale Effective Date.

(d) agrees to procure that upon each Vessel Sale the relevant Existing Owner executes a Memorandum of Termination with Charterer agreeing and confirming that all rights and obligations of the parties under the Existing Charter shall cease and determine with effect from the date of termination provided that this shall not affect or prejudice any claim or demand that either party may have against the other under or in connection with the Existing Charter arising before the date of termination (it being acknowledged and agreed by the Existing Owner that it shall have no claim against the Charterer for early or wrongful termination of the Charter or early redelivery of the Ship.

(e) agrees to procure that upon each Vessel Sale each New Owner and the respective New Mortgagee enters into a subordination and non-disturbance agreement with Charterer in a form acceptable to the Charterer and New Mortgagee.

7    For the avoidance of any doubt, if, due to any reason whatsoever, any of the above matters fails to be fulfilled until 30 April 2015 , as a consequence the matters contained in this letter becomes null and void. The Existing Charters shall however remain valid and binding in all respects between the parties thereof.

8    The Charterer, by countersigning this Letter, hereby agrees and consents to the contents contained herein.

54142964v2     D01249

9      This Letter and any non-contractual obligations arising under or in connection with it shall be governed by English law.

Yours faithfully

...................................................
For and on behalf of
GEDEN HOLDINGS LTD.

Name: Tuğrul Tokgöz
Title:   Director

Agreed, consented and accepted:

For and on behalf of
SHELL WESTERN SUPPLY AND TRADING LIMITED

Name: David Chapman
Title: General Manager

ANNEX 1

VESSELS

| Vessel | Existing Owner | New Owner | Existing Mortgagee | New Mortgagee |
|---|---|---|---|---|
| Profit (tbr Advantage Solar) | Profit Shipping Ltd. of Malta | Advantage Solar Shipping LLC of the Marshall Islands | DVB Bank NV | DVB Bank NV |
| Target (tbr Advantage Arrow) | Target Shipping Ltd. of Malta | Advantage Arrow Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Bravo (tbr Advantage Atom) | Bravo Shipping Ltd. of Malta | Advantage Atom Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| True (tbr Advantage Avenue) | True Shipping Ltd. of Malta | Advantage Avenue Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Blue (tbr Advantage Sky) | Blue Shipping Ltd. of Malta | Advantage Sky Shipping LLC of the Marshall Islands | Commerzbank AG | Hayfin Capital Management LLP |
| Blank (tbr Advantage Start) | Blank Shipping Ltd. of Malta | Advantage Start Shipping LLC of the Marshall Islands | Bank of America NA | CIT Finance LLC |



| Value (tbr Advantage Award) | Value Shipping Ltd. of Malta | Advantage Award Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
|---|---|---|---|---|
| Power (tbr Advantage Anthem) | Barbaros Maritime Ltd. of Malta | Advantage Anthem Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| Royal (tbr Advantage Sun) | Prima Shipping Ltd. of Malta | Advantage Sun Shipping LLC of the Marshall Islands | Credit Europe NV | CIT Finance LLC |

ANNEX 2
PRO-FORMA OF NEW CHARTER

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update *(incorporating ST4 Version 1.1 Apr06 plus additional clauses)*

**Time Charter Party**
LONDON,    22 May 2015

IT IS THIS DAY AGREED between Advantage Award Shipping LLC | 1
of Bahamas (hereinafter referred to as "Owners"), being owners | 2
of the good motor/steam* vessel called M/T Advantage Award | 3
(hereinafter referred to as "the vessel") described as per Clause 1 hereof and Shell Western Supply and Trading | 4
of Barbados (hereinafter referred to as "Charterers"); | 5

| | | | |
|---|---|---|---|
| Description | 1. | | At the date of delivery of the vessel under this charter and throughout the charter period: | 6 |

| | | |
|---|---|---|
| Description And Condition of Vessel | (a) | she shall be classed by a Classification Society which is a member of the International Association of Classification Societies; |
| | (b) | she shall be in every way fit to carry crude petroleum and/or its products; |
| | (c) | she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator, radar, computers and computer systems) in a good and efficient state; |
| | (d) | her tanks, valves and pipelines shall be oil-tight; |
| | (e) | she shall be in every way fitted for burning, in accordance with the grades specified in Clause 29 hereof; |
| | (i) | at sea, fuel oil for main propulsion and fuel oil/marine diesel oil* for auxiliaries; |
| | (ii) | in port, fuel oil/marine diesel oil* for auxiliaries; |
| | (f) | she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals as appropriate upon expansion by day and night without delay; |
| | (g) | she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay; |
| | (h) | she shall comply with the description in the OCIMF Harmonised Vessel Particulars Questionnaire appended hereto as Appendix A, provided however that if there is any conflict between the provisions of this questionnaire and any other provision, including this Clause 1, of this charter such other provisions shall govern; |
| | (i) | her ownership structure, flag, registry, classification society and management company shall not be changed without Charterers' approval |

Line numbers for the above block: 7–27

| | | |
|---|---|---|
| Safety Management | (j) | Owners will operate: |
| | (i) | a safety management system certified to comply with the International Safety Management Code ("ISM Code") for the Safe Operation of Ships and for Pollution Prevention; |
| | (ii) | a documented safe working procedures system (including procedures for the identification and mitigation of risks); |
| | (iii) | a documented environmental management system; |
| | (iv) | documented accident/incident reporting system compliant with flag state requirements; |
| | (k) | Owners shall submit to Charterers a monthly written report detailing all accidents/incidents and environmental reporting requirements, in accordance with the "Shell Safety and Environmental Monthly Reporting Template" appended hereto as Appendix B; |
| | (l) | Owners shall maintain Health Safety Environmental ("HSE") records sufficient to demonstrate compliance with the requirements of their HSE system and of this charter. Charterers reserve the right to confirm compliance with HSE requirements by audit of Owners. |
| | (m) | Owners will arrange at their expense for a SIRE inspection to be carried out four months plus or minus fifteen days after Charterers' SIRE inspection provided vessel is not on floating storage. In the event vessel is engaged in storage or otherwise unavailable for inspection within the stipulated window Owners will request a SIRE inspection at the earliest opportunity thereafter. |

Line numbers: 28–44

| | | |
|---|---|---|
| Shipboard Personnel And their | 2. | (a) | At the date of delivery of the vessel under this charter and throughout the charter period: |
| | | (i) | she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required |

Line numbers: 45–47

---

* Delete as appropriate.

D01254
Case ID: 200300816

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (incorporating ST4 Version 1.1 Apr06 plus additional clauses)

| | | | | |
|---|---|---|---|---|
| Duties | | | by the laws of the flag state and who shall be trained to operate the vessel and her | 48 |
| | | | equipment competently and safely; | 49 |
| | | (ii) | all shipboard personnel shall hold valid certificates of competence in accordance | 50 |
| | | | with the requirements of the law of the flag state; | 51 |
| | | (iii) | all shipboard personnel shall be trained in accordance with the relevant | 52 |
| | | | provisions of the International Convention on Standards of Training, Certification | 53 |
| | | | and Watchkeeping for Seafarers, 1995 or any additions, modifications or | 54 |
| | | | subsequent versions thereof; | 55 |
| | | (iv) | there shall be on board sufficient personnel with a good working knowledge of | 56 |
| | | | the English language to enable cargo operations at loading and discharging places | 57 |
| | | | to be carried out efficiently and safely and to enable communications between the | 58 |
| | | | vessel and those loading the vessel or accepting discharge there from to be | 59 |
| | | | carried out quickly and efficiently; | 60 |
| | | (v) | the terms of employment of the vessel's staff and crew will always remain | 61 |
| | | | acceptable to The International Transport Worker's Federation and the vessel | 62 |
| | | | will at all times carry a Blue Card; | 63 |
| | | (vi) | the nationality of the vessel's officers given in the OCIMF Vessel Particulars | 64 |
| | | | Questionnaire referred to in Clause 1(m) will not change without Charterers' prior | 65 |
| | | | agreement | 66 |
| | (b) | | Owners guarantee that throughout the charter service the master shall with the vessel's officers | 67 |
| | | | and crew, unless otherwise ordered by Charterers; | 68 |
| | | (i) | prosecute all voyages with the utmost despatch; | 69 |
| | | (ii) | render all customary assistance; and | 70 |
| | | (iii) | load and discharge cargo as rapidly as is safely possible when required by Charterers or | 71 |
| | | | their agents to do so, by night or by day, but always in accordance with the laws | 72 |
| | | | of the place of loading or discharging (as the case may be) and in each case in | 73 |
| | | | accordance with any applicable laws of the flag state. | 74 |
| Duty to Maintain | 3. (a) | | Throughout the charter service Owners shall, whenever the passage of time, wear and tear or | 75 |
| | | | any event (whether or not coming within Clause 27 hereof) requires steps to be taken to | 76 |
| | | | maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to | 77 |
| | | | maintain or restore the vessel. | 78 |
| | (b) | | If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the | 79 |
| | | | requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to | 80 |
| | | | indemnify Charterers for such failure. If and to the extent that such failure affects the time taken | 81 |
| | | | by the vessel to perform any services under this charter, hire shall be reduced by an amount | 82 |
| | | | equal to the value, calculated at the rate of hire, of the time so lost. | 83 |
| | | | Any reduction of hire under this sub-Clause (b) shall be without prejudice to any other remedy | 84 |
| | | | available to Charterers, but where such reduction of hire is in respect of time lost, such time | 85 |
| | | | shall be excluded from any calculation under Clause 24. | 86 |
| | (c) | | If Owners are in breach of their obligations under Clause 3(a), Charterers may so notify Owners | 87 |
| | | | in writing and if, after the expiry of 30 days following the receipt by Owners of any such notice, | 88 |
| | | | Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due | 89 |
| | | | diligence as required in Clause 3(a), the vessel shall be off-hire, and no further hire payments | 90 |
| | | | shall be due, until Owners have so demonstrated that they are exercising such due diligence. | 91 |
| | (d) | | Owners shall advise Charterers immediately, in writing, should the vessel fail an inspection by, | 92 |
| | | | but not limited to, a governmental and/or port state authority, and/or terminal and/or major | 93 |
| | | | charterer of similar tonnage. Owners shall simultaneously advise Charterers of their proposed | 94 |
| | | | course of action to remedy the defects which have caused the failure of such inspection. | 95 |
| | (e) | | If, in Charterers reasonably held view: | 96 |
| | | (i) | failure of an inspection, or, | 97 |
| | | (ii) | any finding of an inspection, | 98 |
| | | | referred to in Clause 3 (d), prevents normal commercial operations then Charterers have the | 99 |
| | | | option to place the vessel off-hire from the date and time that the vessel fails such inspection, or | 100 |
| | | | becomes commercially inoperable, until the date and time that the vessel passes a re-inspection | 101 |
| | | | by the same organisation, or becomes commercially operable, which shall be in a position no | 102 |
| | | | less favourable to Charterers than at which she went off-hire. | 103 |
| | (f) | | Furthermore, at any time while the vessel is off-hire under this Clause 3 (with the exception of | 104 |
| | | | Clause 3(e)(ii)), Charterers have the option, where Owners fail to exercise significant due diligence as required under | 105 |
| | | | this Charter or if the vessel has become unsuitable to Shell's Ship Quality Assurance, to terminate this charter by | |

D01255
Case ID: 200300816

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (incorporating ST4 Version 1.1 Apr06 plus additional clauses)

|  |  |  |  |
|---|---|---|---|
|  |  | giving notice in writing, such termination only becoming effective if Owners are unable to rectify outstanding issues | 106 |
|  |  | within 30 days of receipt of such notice. to terminate this charter by giving notice in writing | 107 |
|  |  | with effect from the date on which such notice of termination is received by Owners or from any | 108 |
|  |  | later date stated in such notice. This sub-Clause (f) is without prejudice to any rights of | 109 |
|  |  | Charterers or obligations of Owners under this charter or otherwise (including without limitation |  |
|  |  | Charterers' rights under Clause 24 hereof). |  |
| Period, | 4. (a) | Owners agree to let and Charterers agree to hire the vessel for a period of 5 (five) years | 110 |
| Trading |  | plus or minus 30 days in Charterers' option, commencing from the time and date of delivery | 111 |
| Limits and |  | of the vessel, and Charterers shall have an option to extend the charter party for an additional 3 (three) years,  (Such | 112 |
| Safe Places |  | option to be declared within 90 days to the end of initial 5 year period) for the purpose of carrying all lawful |  |
|  |  | merchandise (subject always to Clause 28) |  |
|  |  | including in particular; Crude oil, Dirty Petroleum Products (Including Fuel Oil, VGO, Carbon Black, Special Industrial | 113 |
|  |  | Fuel Oil, LSWR, but excluding asphalt) and Clean Petroleum Products.  (All time and costs incurred preparing |  |
|  |  | vessel's tanks, lines and pumps for the carriage of clean petroleum product to be for Charterers' account.) |  |
|  |  |  | 114 |
|  |  | in any part of the world, as Charterers shall direct, subject to the limits of the current British | 115 |
|  |  | Institute Warranties and any subsequent amendments thereof. Notwithstanding the foregoing, | 116 |
|  |  | but subject to Clause 35, Charterers may order the vessel to ice-bound waters however the vessel shall not force ice | 117 |
|  |  | or follow icebreakers or to any part of |  |
|  |  | the world outside such limits provided that Owners' consent thereto (such consent not to be | 118 |
|  |  | unreasonably withheld) and that Charterers pay for any insurance premium required by the | 119 |
|  |  | vessel's underwriters as a consequence of such order. Always excluded from trading limits are any States where | 120 |
|  |  | employing the vessel in any carriage, trade or voyage would expose the vessel, Owners or Charterers to any |  |
|  |  | sanction imposed by the US and/or UN and/or EU. |  |
|  | (b) | Any time during which the vessel is off-hire under this charter may be added to the charter | 121 |
|  |  | period in Charterers' option up to the total amount of time spent off-hire, In such cases the rate | 122 |
|  |  | of hire will be that prevailing at the time the vessel would, but for the provisions of this Clause, | 123 |
|  |  | have been redelivered, was off-hire. | 124 |
|  | (c) | Charterers shall use due diligence to ensure that the vessel is only employed between and at safe | 125 |
|  |  | places (which expression when used in this charter shall include ports, berths, wharves, docks, | 126 |
|  |  | anchorages, submarine lines, alongside vessels or lighters, and other locations including | 127 |
|  |  | locations at sea) where she can safely lie always afloat.  Notwithstanding anything contained in | 128 |
|  |  | this or any other clause of this charter, Charterers do not warrant the safety of any place to | 129 |
|  |  | which they order the vessel and shall be under no liability in respect thereof except for loss or | 130 |
|  |  | damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the | 131 |
|  |  | vessel shall be loaded and discharged at any places as Charterers may direct, provided that | 132 |
|  |  | Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall | 133 |
|  |  | conform to standards not less than those set out in the latest published edition of the | 134 |
|  |  | ICS/OCIMF Ship-to-Ship Transfer Guide. | 135 |
|  | (d) | Unless otherwise agreed, the vessel shall be delivered by Owners dropping outward pilot at a | 136 |
|  |  | port in | 137 |
|  |  | when/where ready, with or without cargo, at sea or in port | 138 |
|  |  | at Owners' option and redelivered to Owners dropping outward pilot at a port in | 139 |
|  |  | Worldwide - WIWL | 140 |
|  |  | at Charterers' option. | 141 |
|  | (e) | The vessel will deliver with last cargo(es) of Crude Oil or Dirty Petroleum Products and will redeliver with last | 142 |
|  |  | cargo(es)of Crude Oil or Dirty Petroleum Products |  |
|  | (f) | Owners are required to give keep Charterers closely advised days prior notice of delivery prospects and Charterers | 143 |
|  |  | are |  |
|  |  | required  to give Owners approximate 30, 20 15, 10, 7 and definite 5, 3, 2, 1 days prior notice of redelivery. | 144 |
| Laydays/ | 5. | The vessel shall not be delivered to Charterers before 1st May  2015 | 145 |
| Cancelling |  | and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their | 146 |
|  |  | disposal on or before 31st July 2015 | 147 |
| Owners to | 6. | Owners undertake to provide and to pay for all provisions, wages (including but not limited to all | 148 |
| Provide |  | overtime payments except as provided in Additional Clause (4), and shipping and discharging fees and all other expenses | 149 |
|  |  | of the master, officers |  |
|  |  | and crew; also, except as provided in Clauses 4 and 34 hereof and Additional Clause 6, for all insurance on the vessel, for | 150 |
|  |  | all |  |
|  |  | deck, cabin and engine-room stores, and for water except that used for Charterers' purposes such as cleaning, rinsing or | 151 |

D01256

Case ID: 200300816

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (incorporating ST4 Version 1.1 Apr08 plus additional clauses)

|  |  |  |  |  |
|---|---|---|---|---|
| | | | flushing of tanks and/or lines; for all drydocking, overhaul, maintenance and | 162 |
| | | | repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' obligations under | 163 |
| | | | this Clause 6 extend to all liabilities for customs or import duties arising at any time during the | 164 |
| | | | performance of this charter in relation to the personal effects of the master, officers and crew, and in | 165 |
| | | | relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for | 166 |
| | | | and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been | 167 |
| | | | compelled to pay in respect of any such liability. Any amounts allowable in general average for wages | 168 |
| | | | and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a | 169 |
| | | | Period when the vessel is on-hire. | 160 |

| Charterers to Provide | 7. | (a) | Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage | 161 |
| | | | and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and | 162 |
| | | | unloading cargoes, canal dues and all charges other than those payable by Owners in | 163 |
| | | | accordance with Clause 6 hereof, provided that all charges for the said items shall be for | 164 |
| | | | Owners' account when such items are consumed, employed or incurred for Owners' purposes or | 165 |
| | | | while the vessel is off-hire (unless such items reasonably relate to any service given or distance | 166 |
| | | | made good and taken into account under Clause 21 or 22) ; and provided further that any fuel | 167 |
| | | | used in connection with a general average sacrifice or expenditure shall be paid for by Owners. | 168 |
| | | (b) | In respect of bunkers consumed for Owners' purposes these will be charged on each occasion | 169 |
| | | | by Charterers on a "first-in-first-out" basis valued on the prices actually paid by Charterers. | 170 |
| | | (c) | If the trading limits of this charter include ports in the United States of America and/or its | 171 |
| | | | protectorates then Charterers shall reimburse Owners for port specific charges relating to | 172 |
| | | | additional premiums charged by providers of oil pollution cover, when incurred by the vessel | 173 |
| | | | calling at ports in the United States of America and/or its protectorates in accordance with | 174 |
| | | | Charterers orders. | 175 |

| Rate of Hire | 8. | | Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of  XX United | 176 |
| | | | States Dollars per day, and pro rata for any part of a day, from | 177 |
| | | | the time and date of her delivery (local time) to Charterers until the time and date of redelivery (local | 178 |
| | | | time) to Owners. Charterers to pay an additional $XXXX per month for communications/victualling, payable with hire, | |
| | | | a market related rate which shall be payable on the 4th day each month in accordance with the calculation in the attached | |
| | | | spreadsheet and based on the previous month's inputs, as described in Appendix A (annexed to this Charter Party). | 179 |

| Payment of Hire | 9. | | Subject to Clause 3 (c) and 3 (e), payment of hire shall be made in immediately available funds | 180 |
| | | | to: | 181 |
| | | | Beneficiary : Advantage Award Shipping LLC | 182 |
| | | | Bank : Unicredit Bank AG, Hamburg /   IBAN : DE58200300000016248130 | |
| | | | | 183 |
| | | | | 184 |
| | | | in United States Dollars per calendar month in advance, less: | 185 |
| | | (i) | any hire paid which Charterers reasonably estimate to relate to agreed off-hire periods, and; | 186 |
| | | (ii) | any amounts disbursed on Owners' behalf, any advances and commission thereon, and | 187 |
| | | | charges which are for Owners' account pursuant to any provision hereof, and; | 188 |
| | | (iii) | any amounts due or reasonably estimated to become due to Charterers under Clause 3 (c) | 189 |
| | | | or 24 hereof; | 190 |
| | | | any such adjustments to be made at the due date for the next monthly payment after the facts | 191 |
| | | | have been ascertained. Charterers shall not be responsible for any delay or error by Owners' | 192 |
| | | | bank in crediting Owners' account provided that Charterers have made proper and timely | 193 |
| | | | payment. | 194 |
| | | | In default of such proper and timely payment: | 195 |
| | | (a) | Owners shall notify Charterers of such default and Charterers shall within seven days of receipt | 196 |
| | | | of such notice pay to Owners the amount due, including interest, failing which Owners may | 197 |
| | | | withdraw the vessel from the service of Charterers without prejudice to any other rights Owners | 198 |
| | | | may have under this charter or otherwise; and | 199 |
| | | (b) | interest on any amount due but not paid on the due date shall accrue from the day after that date | 200 |
| | | | up to and including the day when payment is made, at a rate per annum which shall be 1% | 201 |
| | | | above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank Wall Street Journal in New York at | 202 |
| | | | 12.00 New York time on the due date, or, if no such interest rate is published on that day, the | 203 |
| | | | interest rate published on the next preceding day on which such a rate was so published, | 204 |
| | | | computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually. | 205 |
| Space Available to | 10. | | The whole reach, burthen and decks of the vessel and any passenger accommodation (including | 206 |
| | | | Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the | 207 |

D01257
Case ID: 200300816

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update *(incorporating ST4 Version 1.1 Apr06 plus additional clauses)*

| | | | |
|---|---|---|---|
| Charterers | | vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed 500 tonnes (excluding lubes and water), at any time during the charter period. | 208 209 210 |
| Segregated Ballast | 11. | In connection with the Council of the European Union Regulation on the implementation of IMO Resolution A747(18) Owners will ensure that the following entry is made on the International Tonnage Certificate (1969) under the section headed "remarks": | 211 212 213 |
| | | "The segregated ballast tanks comply with the Regulation 13 of Annex 1 of the International Convention for the prevention of pollution from ships, 1973, as modified by the Protocol of 1978 relating thereto, and the total tonnage of such tanks exclusively used for the carriage of segregated water ballast is _____  The reduced gross tonnage which should be used for the calculation of  tonnage based fees is _____". | 214 215 216 217 218 |
| Instructions And Logs | 12. | Charterers shall from time to time give the master all requisite instructions and sailing directions which shall be confirmed in writing, and | 219 |
| | | the master shall keep a full and, correct log of the voyage or voyages, which Charterers or their agents may inspect as required.  The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master. | 220 221 222 223 224 |
| Bills of Lading | 13.  (a) | The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign Bills of Lading as Charterers or their agents may direct (subject always to Clauses 35 (a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise; | 225 226 227 228 229 |
| | | (i)   from signing Bills of Lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such Bills of Lading fail to conform to the requirements of this charter, or (except as provided in Clause 13 (b) from the master otherwise complying with Charterers' or their agents' orders; | 230 231 232 233 |
| | | (ii)  from any irregularities in papers supplied by Charterers or their agents. | 234 |
| | (b) | If Charterers by telex, facsimile or other form of written communication that specifically refers to this Clause request Owners to discharge a quantity of cargo either without Bills of Lading and/or at a discharge place other than that named in a Bill of Lading and/or that is different from the Bill of Lading quantity, then Owners shall discharge such cargo in accordance with Charterers' instructions in consideration of receiving the following indemnity which shall be deemed to be given by Charterers on each and every such occasion and which is limited in value to 200% 400% of the CIF value of the cargo carried on board; | 235 236 237 238 239 240 241 |
| | | "(i)   Charterers shall indemnify Owners  and Owners' servants and agents in respect of any liability loss or damage of whatsoever nature (including legal costs as between attorney or solicitor and client and associated expenses) which Owners may sustain by reason of delivering such cargo in accordance with Charterers' request. | 242 243 244 245 |
| | | (ii)  If any proceeding is commenced against Owners or any of Owners' servants or agents in connection with the vessel having delivered cargo in accordance with such request, Charterers shall provide Owners or any of Owners' servants or agents from time to time on demand with sufficient funds to defend the said proceedings. | 246 247 248 249 |
| | | (iii) If the vessel or any other vessel or property belonging to Owners should be arrested or detained, or if the arrest or detention thereof should be threatened, by reason of discharge in accordance with Charterers' instruction as aforesaid, Charterers shall provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such vessel or property and Charterers shall indemnify Owners in respect of any loss, damage or expenses caused by such arrest or detention whether or not same may be justified. | 250 251 252 253 254 255 |
| | | (iv) Charterers shall, if called upon to do so at any time while such cargo is in Charterers' possession, custody or control, redeliver the same to Owners. | 256 257 |
| | | (v) As soon as all original Bills of Lading for the above cargo which name as discharge port the place where delivery actually occurred shall have arrived and/or come into Charterers' possession, Charterers shall produce and deliver the same to Owners whereupon Charterers' liability hereunder shall cease. | 258 259 260 261 |
| | | Provided however, if Charterers have not received all such original Bills of Lading by 24.00 hours on the day 36 calendar months after the date of discharge, that this indemnity shall terminate at that time unless before that time Charterers have received from Owners written | 262 263 264 |

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update *(incorporating ST4 Version 1.1 April) plus additional clauses)*

|  |  |  |  |
|---|---|---|---|
|  |  | notice that: | 265 |
|  |  | a) Some person is making a claim in connection with Owners delivering cargo pursuant to | 266 |
|  |  | Charterers request or, | 267 |
|  |  | b) Legal proceedings have been commenced against Owners and/or carriers and/or | 268 |
|  |  | Charterers and/or any of their respective servants or agents and/or the vessel for the same | 269 |
|  |  | reason. | 270 |
|  |  | When Charterers have received such a notice, then this indemnity shall continue in force until | 271 |
|  |  | such claim or legal proceedings are settled. Termination of this indemnity shall not prejudice | 272 |
|  |  | any legal rights a party may have outside this indemnity. | 273 |
|  |  | (vi) Owners shall promptly notify Charterers if any person (other than a person to whom | 274 |
|  |  | Charterers ordered cargo to be delivered) claims to be entitled to such cargo and/or if the vessel | 275 |
|  |  | or any other property belonging to Owners is arrested by reason of any such discharge of cargo. | 276 |
|  |  | vii) This indemnity shall be governed and construed in accordance with the English law and | 277 |
|  |  | each and any dispute arising out of or in connection with this indemnity shall be subject to the | 278 |
|  |  | jurisdiction of the High Court of Justice of England". | 279 |
|  | (c) | Owners warrant that the Master will comply with orders to carry and discharge against one or | 280 |
|  |  | more Bills of Lading  from a set of original negotiable Bills of Lading should Charterers so | 281 |
|  |  | require. | 282 |

| Conduct of Vessel's Personnel | 14. | If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible. | 283 284 285 286 |
|---|---|---|---|
| Bunkers at Delivery and Redelivery | 15. | Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the price actually paid, on a "first-in-first-out" basis. Such prices are to be supported by paid invoices. | 287 288 289 290 |
|  |  | Vessel to be delivered to and redelivered from the charter with, at least, a quantity of bunkers on board sufficient to safely reach the nearest main bunkering port. | 291 292 |
|  |  | Notwithstanding anything contained in this charter all bunkers on board the vessel shall, throughout the duration of this charter, remain the property of Charterers and can only be purchased on the terms specified in the charter at the end of the charter period or, if earlier, at the termination of the charter. | 293 294 295 296 |
| Stevedores, Pilots, Tugs | 16. | Stevedores, when required, shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged.  Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that; | 297 298 299 300 301 302 303 304 |
|  | (a) | the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and; | 305 306 307 |
|  | (b) | Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores. | 308 309 310 |
| Super-Numeraries | 17. | Charterers may send representatives at their time, risk and expense in the vessel's available accommodation upon any voyage made | 311 |
|  |  | under this charter, Owners finding provisions and all requisites as supplied to officers, except alcohol. Charterers paying at the rate of United States Dollars 16 (fifteen) per day for each representative while on board the vessel. | 312 313 314 |
| Sub-letting/ Assignment/ Novation | 18. | Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. Additionally Charterers may assign or novate this charter to any company of the Royal Dutch/ Shell Group of Companies. | 315 316 317 |
| Final Voyage | 19. | If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for; | 318 319 320 321 |
|  | (a) | disbursements on Owners' behalf or charges for Owners' account pursuant to any provision | 322 |

D01259

Case ID: 200300816

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update *(incorporating ST4 Version 1.1 Apr06 plus additional clauses)*

|  |  |  |  |
|--|--|--|--|
| | | hereof; and; | 323 |
| | (b) | bunkers on board at redelivery pursuant to <u>Clause 15</u>. | 324 |
| | | Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made | 325 |
| | | good by Charterers. | 326 |
| | | If at the time this charter would otherwise terminate in accordance with <u>Clause 4</u> the vessel is on a | 327 |
| | | ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the | 328 |
| | | use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete | 329 |
| | | such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by | 330 |
| | | this charter, as the case may be. | 331 |

Loss of Vessel  20.  Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her  332
loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at  333
noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss;  334
should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on  335
which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers  336
and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at  337
the time of termination, at the price paid by Charterers at the last bunkering port.  338

Off-hire  21. (a)  On each and every occasion that there is loss of time (whether by way of interruption in the  339
vessel's service or, from reduction in the vessel's performance, or in any other manner);  340

    (i)  due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and  341
waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery,  342
boilers or other parts of the vessel or her equipment (including without limitation tank  343
coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to  344
the vessel; or any other similar cause preventing the efficient working of the vessel; and  345
such loss continues for more than three consecutive hours (if resulting from interruption  346
in the vessel's service) or cumulates to more than three hours (if resulting from partial  347
loss of service); or;  348

    (ii)  due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of  349
the master, officers or crew; or;  350

    (iii)  for the purpose of obtaining medical advice or treatment for or landing any sick or  351
injured person (other than a Charterers' representative carried under <u>Clause 17</u> hereof) or  352
for the purpose of landing the body of any person (other than a Charterers'  353
representative), and such loss continues for more than three consecutive hours; or;  354

    (iv)  due to any delay in quarantine arising from the master, officers or crew having had  355
communication with the shore at any infected area without the written consent or  356
instructions of Charterers or their agents, or to any detention by customs or other  357
authorities caused by smuggling or other infraction of local law on the part of the master,  358
officers, or crew; or;  359

    (v)  due to detention of the vessel by authorities at home or abroad attributable to legal  360
action against or breach of regulations by the vessel, the vessel's owners, or Owners  361
(unless brought about by the act or neglect of Charterers); then;  362
without prejudice to Charterers' rights under <u>Clause 3</u> or to any other rights of Charterers  363
hereunder, or otherwise, the vessel shall be off-hire from the commencement of such loss of  364
time until she is again ready and in an efficient state to resume her service from a position not  365
less favourable to Charterers than that at which such loss of time commenced; provided,  366
however, that any service given or distance made good by the vessel whilst off-hire shall be  367
taken into account in assessing the amount to be deducted from hire.  368

    (vi)  <u>Not withstanding the paragraph above, if the vessel is placed under arrest or is detained by authorities</u>
<u>pending investigation of Owners' (including, but not limited to Owners' affiliated parties, their agents or their</u>
<u>representatives) failure to pay any monies that are owed, or are disputed to be owed by Owners (including, but</u>
<u>not limited to Owners' affiliated parties, their agents or their representatives), Charterers may place the vessel</u>
<u>off-hire. The period of off-hire shall be calculated from the time that the authorities place the vessel under arrest</u>
<u>until she is again ready and in an efficient state to resume her service from a position not less favorable to</u>
<u>Charterers than that at which such loss of time commenced; provided, however, that any service given or</u>
<u>distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be</u>
<u>deducted from hire.</u>

    a.  <u>Owners will at all times keep Charterers informed about any pending claims or request for security or dispute</u>
<u>that might result in a creditor or claimant enforcing their rights against the vessel or against Owners</u>

D01260
Case ID: 200300816

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update *(incorporating ST4 Version 1.1 Apr06 plus additional clauses)*

(including, but not limited to Owners' affiliated parties, their agents or their representatives.) If the Owners fail so to notify Charterers, any costs associated with releasing cargo from an arrested vessel and/or the additional costs associated with fixing a replacement vessel for a voyage charter, shall be for the Owners' account.

   b.   Owners undertake to discuss with Charterers all possible measures to avoid arrest of vessel or other action by creditors or claimants.

   c.   In the event the vessel is placed under arrest or is detained by authorities as described above and Owners fail to fulfil their obligations under sections a and b above in any respect, then Charterers may also deduct any idle time that Charterers might incur by reason of the vessel being placed off-hire under this clause. Charterers will endeavor their best efforts for the earliest employment consistent with their normal trading practice, but in any case, such idle time that may be deducted from hire not to exceed 15 days.

  (h)  If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between;    360 / 370 / 371

    (i)  the time the vessel would have required to perform the relevant service at such guaranteed speed less adverse weather periods, and;    372 / 373

    (ii)  the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).    374 / 375

      For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.    376 / 377

  (c)  Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.    378 / 379 / 380 / 381 / 382 / 383 / 384 / 385 / 386 / 387 / 388 / 389

  (d)  If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.    390 / 391 / 392 / 393 / 394

  (e)  Time during which the vessel is off-hire under this charter shall count as part of the charter period except where Charterers declare their option to add off-hire periods under Clause 4 (b).    395 / 396

  (f)  All references to "time" in this charter party shall be references to local time except where otherwise stated.    397 / 398

**Periodical Drydocking**   22. (a)  Owners have the right and obligation to drydock the vessel at regular intervals of as required by Classification Society Rules or in the event of an emergency/unforeseen circumstances    399

     On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than 90 days (emergency/unforeseen circumstances excepted) before such date, and Charterers shall offer a port for such    400 / 401

     periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable.    402 / 403

     Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any Bill of Lading or this charter with the exception of any slops which are the property of Charterers from their instructions to clean at various intervals. Such slops to be disposed of by Owners, but Charterers to reimburse disposal costs.    404 / 405 / 406 / 407 / 408

  (b)  If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at    409 / 410 / 411 / 412

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (incorporating ST4 Version 1.1 Apr06 plus additional clauses)

|  |  |  |  |
|---|---|---|---|
|  |  | which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However; | 413 414 |
|  | (i) | provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and; | 415 416 417 418 |
|  | (ii) | any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there. | 419 420 421 |
|  |  | Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24. | 422 423 |
|  |  | The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners account. | 424 425 |
|  | (c) | If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port. | 426 427 428 429 430 431 432 433 434 |
|  | (d) | Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port. | 435 436 437 438 |

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update *(Incorporating ST4 Version 1.1 Apr06 plus additional clauses)*

Idle / Anchorage:                                   6 mt/day

~~The foregoing bunker consumptions are for all purposes except cargo heating and tank-cleaning~~
~~and shall be pro-rated between the speeds shown.~~                                                                      463

The service speed of the vessel is 14.5 knots laden and 14.5 knots in ballast and in the absence        464
of Charterers' orders to the contrary the vessel shall proceed at the service speed.  However if         465
more than one laden and one ballast speed are shown in the table above Charterers shall have             466
the right to order the vessel to steam at any speed within the range set out in the table (the           467
"ordered speed").                                                                                       468
If the vessel is ordered to proceed at any speed other than the highest speed shown in the               469
table, and the average speed actually attained by the vessel during the currency of such order          470
exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the                 471
purpose of calculating a decrease of hire under this Clause 24 the maximum recognised speed              472
shall be used in place of the average speed actually attained.                                           473
For the purposes of this charter the "guaranteed speed" at any time shall be the then-current            474
ordered speed or the service speed, as the case may be.                                                  475
The average speeds and bunker consumptions shall for the purposes of this Clause 24 be                   476
calculated by reference to the observed distance from pilot station to pilot station on all sea          477
passages excluding lighterings and voyages less than 48 consecutive hours during each period stipulated in Clause 24   478
(c), but excluding any time during which                                                                 479
the vessel is (or but for Clause 22 (b) (i) would be) off-hire and also excluding "Adverse               480
Weather Periods", being;                                                                                 481
    (i)   any periods during which reduction of speed is necessary for safety in congested waters   482
        or in poor visibility;                                                       483
    (ii)  ~~any days, noon to noon, when winds exceed force 4 on the Beaufort Scale for more than~~   484
       ~~12 hours.~~                                                                      485
(b) If during any calendar year from the date on which the vessel enters service the                     486
vessel falls below or exceeds the performance guaranteed in Clause 24 (a) then if such                   487
shortfall or excess results:                                                                            488
    (i)   from a reduction or an increase in the average speed of the vessel, compared to the speed   489
        guaranteed in Clause 24 (a), then an amount equal to the value at the hire rate of the time   490
        so lost or gained, as the case may be, shall be included in the performance calculation;   491
    (ii)  from an increase or a decrease in the total bunkers consumed, compared to the total   492
       bunkers which would have been consumed had the vessel performed as guaranteed in         493
       Clause 24 (a), an amount equivalent to the value of the additional bunkers consumed or   494
       the bunkers saved, as the case may be, based on the average price paid by Charterers for   495
       the vessel's bunkers in such period,  shall be included in the performance calculation.   496
The results of the performance calculation for laden and ballast mileage respectively shall be           497
adjusted to take into account the mileage steamed in each such condition during Adverse Weather          498
Periods, by dividing such addition or deduction by the number of miles over which the                    499
performance has been calculated and multiplying by the same number of miles plus the miles               500
steamed during the Adverse Weather Periods, in order to establish the total performance                  501
calculation for such period.                                                                            502
Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other             503
remedy available to Charterers.                                                                         504
(c) Calculations under this Clause 24 shall be made for the yearly periods terminating 31 December excepting the   505
year of vessel's redelivery. The balance of the year in which the vessel enters service shall be included in the   506
following calendar year's performance review.                                                           507
Claims in respect of reduction of hire arising under this Clause during the final year or part           508
year of the charter period shall in the first instance be settled in accordance with Charterers'         509
estimate made two ~~one~~ months before the end of the charter period.  Any necessary adjustment         510
after this charter terminates shall be made by payment by Owners to Charterers or by                     511
Charterers to Owners as the case may require.                                                           512
(d) Owners and Charterers agree that this Clause 24 is assessed on the basis that Owners are not         513
entitled to additional hire for performance in excess of the speeds and consumptions given in            514
this Clause 24.
    (e) In the event of the vessel remaining at a place or port within tropical or sub-tropical waters for more than 28 days
    resulting in fouling of the vessel's hull and/or rudder and/or propeller then Charterers to arrange for underwater
    cleaning at their time and expense and the interim period shall be excluded from performance calculations.
    (f) In the event of an annual underperformance claim being substantiated, such claim shall be off-set against over-

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (*incorporating ST4 Version 1.1 Apr06 plus additional clauses*)

| | | |
|---|---|---|
| | performance attributable to any other "Newco" vessel (aframax/suezmax/vlcc) currently on time-charter to Shell. 'Over-performance' shall be defined as any consumption 5% lesser than the warranted consumption. 'Under-performance' shall be defined as any consumption 5% greater than the warranted consumption. If the performance falls outside of this +/- 5% band, then the full value of the claim shall be calculated from the warranted consumption. Under no circumstances shall such off-setting result in a balance becoming payable by Charterers to Owners. This off-setting arrangement shall apply throughout the entire duration of the charter, but after one (1) year of vessel's delivery the calculation methodology to be mutually agreed. If unable to mutually agree a calculation methodology within 30 days of the aforementioned anniversary date, then Clause 24 shall revert to having no offset agreement until a methodology can be agreed. | |
| Salvage | 25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers, provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25. All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share. | 515<br>516<br>517<br>518<br>519<br>520<br>521 |
| Lien | 26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter. | 522<br>523<br>524<br>525 |
| Exceptions | 27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people.<br>(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property.<br>(c) Clause 27(a) shall not apply to, or affect any liability of Owners or the vessel or any other relevant person in respect of;<br>   (i)   loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or;<br>   (ii)  any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. Any such claim shall be subject to the Hague-Visby Rules or the Hague Rules or the Hamburg Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant Bill of Lading (whether or not such Rules were so incorporated) or, if no such Bill of Lading is issued, to the Hague-Visby Rules unless the Hamburg Rules compulsorily apply in which case to the Hamburg Rules.<br>(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire. | 526<br>527<br>528<br>529<br>530<br>531<br>532<br>533<br>534<br>535<br>536<br>537<br>538<br>539<br>540<br>541<br>542<br>543<br>544<br>545<br>546<br>547<br>548<br>549<br>550<br>551<br>552<br>553<br>554<br>555 |
| Injurious Cargoes | 28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments. | 556<br>557<br>558<br>559 |
| Grade of Bunkers | 29. See Appendix C. Charterers shall supply fuel oil in accordance with ISO Standard 8217 RMG 380 Revised 2005 with a maximum viscosity of 380 CST centistokes at 50 degrees centigrade and/or marine diesel oil for main propulsion and fuel oil with a maximum viscosity of centistokes at 50 degrees centigrade and/or diesel oil for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost | 560<br><br>561<br>562<br>563 |

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update *(incorporating ST4 Version 1.1 Apr06 plus additional clauses)*

|  |  |  |
|---|---|---|
|  | thereof. Charterers shall have the option to instruct the Owners to comingle bunkers when required, compatibility test first having being carried out as per ASTM D4740 and Charterers to be responsible for any expense, damage, time, risk etc which may be caused by the commingling of bunkers. Compatibility test kits and components to be supplied by Charterers at their time/cost. | 564 |
|  | Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with ISO Standard 8217 for Marine Residual Fuels and Marine Distillate Fuels as applicable. | 665<br>566<br>567<br>568 |
| Disbursements | 30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire. | 569<br>570<br>571 |
| Laying-up | 31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay up. Charterers may exercise the said option any number of times during the charter period. | 572<br>573<br>574<br>575<br>576 |
| Requisition | 32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such governments in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period. | 577<br>578<br>579<br>580 |
| Outbreak of War | 33. If war or hostilities break out between any two or more of the following countries: U.S.A., the countries or republics having been part of the former U.S.S.R (except that declaration of war or hostilities solely between any two or more of the countries or republics having been part of the former USSR shall be exempted), P.R.C., U.K., Netherlands, then both Owners and Charterers shall have the right to cancel this charter. | 581<br>582<br>583<br>584<br>585 |
| Additional War Expenses | 34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, including any countries listed by the Joint War Committee in London.<br>Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.<br>Any payments by Charterers under this clause will only be made against proven documentation. Any discount or rebate refunded to Owners, for whatever reason, in respect of additional war risk premium shall be passed on to Charterers. | 586<br>587<br>688<br>689<br>590<br>591<br>592<br>593<br>594<br>595 |
| War Risks | 35. (a) The master shall not be required or bound to sign Bills of Lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions. | 596<br>597<br>598<br>599 |
|  | (b) If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified in writing or by radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned. | 600<br>601<br>602<br>603<br>604<br>605<br>606<br>607<br>608<br>609<br>610<br>611<br>612<br>613 |
|  | (c) The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or | 614<br>615<br>616<br>617<br>618 |

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update *(incorporating ST4 Version 1.1 Apr06 plus additional clauses)*

with the authority of any such government or local authority or by any committee or person 619
having under the terms of the war risks insurance on the vessel the right to give any such 620
directions or recommendations. If by reason of or in compliance with any such directions or 621
recommendations anything is done or is not done, such shall not be deemed a deviation. 622
If by reason of or in compliance with any such direction or recommendation the vessel does 623
not proceed to any place of discharge to which she has been ordered pursuant to this charter, 624
the vessel may proceed to any place which the master or Owners in his or their discretion 625
select and there discharge the cargo or such part of it as may be affected. Such discharge shall 626
be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so 627
discharged is concerned. 628
Charterers shall procure that all Bills of Lading issued under this charter shall contain the 629
Chamber of Shipping War Risks Clause 1952. 630

**Both to Blame Collision Clause**    36. If the liability for any collision in which the vessel is involved while performing this charter falls to 631
be determined in accordance with the laws of the United States of America, the following provision 632
shall apply: 633
"If the ship comes into collision with another ship as a result of the negligence of the other ship and 634
any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation 635
or in the management of the ship, the owners of the cargo carried hereunder will indemnify the 636
carrier against all loss, or liability to the other or non carrying ship or her owners in so far as such loss 637
or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said 638
cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo 639
and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their 640
claim against the carrying ship or carrier." 641
"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship 642
or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of 643
a collision or contact." 644
Charterers shall procure that all Bills of Lading issued under this charter shall contain a provision in 645
the foregoing terms to be applicable where the liability for any collision in which the vessel is 646
involved falls to be determined in accordance with the laws of the United States of America. 647

**New Jason Clause**    37. General average contributions shall be payable according to York/Antwerp Rules, 1994, as amended 648
from time to time, and shall be adjusted in London in accordance with English law and practice but 649
should adjustment be made in accordance with the law and practice of the United States of America, 650
the following position shall apply: 651
"In the event of accident, danger, damage or disaster before or after the commencement of the 652
voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the 653
consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, 654
shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the 655
payment of any sacrifices, losses or expenses of a general average nature that may be made or 656
incurred and shall pay salvage and special charges incurred in respect of the cargo." 657
"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said 658
salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem 659
sufficient to cover the estimated contribution of the cargo and any salvage and special charges 660
thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the 661
carrier before delivery." 662
Charterers shall procure that all Bills of Lading issued under this charter shall contain a provision in 663
the foregoing terms, to be applicable where adjustment of general average is made in accordance 664
with the laws and practice of the United States of America. 665

**Clause Paramount**    38. Charterers shall procure that all Bills of Lading issued pursuant to this charter shall contain the 666
following: 667
"(1)Subject to sub-clause (2) or (3) hereof, this Bill of Lading shall be governed by, and have 668
effect subject to, the rules contained in the International Convention for the Unification of Certain 669
Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague 670
Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the 671
"Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the 672
carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities 673
under the Hague-Visby Rules." 674
"(2)If there is governing legislation which applies the Hague Rules compulsorily to this Bill of 675
Lading, to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject 676
to the Hague Rules. Nothing therein contained shall be deemed to be either a surrender by the carrier 677

D01266
Case ID: 200300816

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update *(incorporating ST4 Version 1.1 Apr06 plus additional clauses)*

|  |  |  |  |
|---|---|---|---|
|  |  | of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules." | 678 679 |

of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules." 678 679

"(3)  If there is governing legislation which applies the United Nations Convention on the Carriage of Goods by Sea 1978 (hereafter the "Hamburg  Rules") compulsorily to this Bill of Lading, to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hamburg Rules. Nothing therein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hamburg Rules." 680 681 682 683 684 685

"(4) If any term of this Bill of Lading is repugnant to the Hague-Visby Rules, or Hague Rules, or Hamburg Rules, as applicable, such term shall be void to that extent but no further." 686 687

"(5) Nothing in this Bill of Lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law." 688 689 690

**Insurance/ ITOPF**  39.  Owners warrant that the vessel is now, and will, throughout the duration of the charter: 691
(a)  be owned or demise chartered by a member of the International Tanker Owners Pollution Federation Limited; 692 693
(b)  be properly entered in West of England P & I Club, being a member of the International Group of P and I Clubs; 694 695
(c)  have in place insurance cover for oil pollution for the maximum on offer through the International Group of P&I Clubs but always a minimum of United States Dollars 1,000,000,000 (one thousand million); 696 697 698
(d)  have in full force and effect Hull and Machinery insurance placed through reputable brokers on Institute Time Clauses or equivalent for the value of United States Dollars 85,000,000 as from time to time may be amended with Charterers' approval, which shall not be unreasonably withheld. 699 700 701 702

Owners will provide, within a reasonable time following a request from Charterers to do so, documented evidence of compliance with the warranties given in this Clause 39. 703 704 705

**Export Restrictions**  40.  The master shall not be required or bound to sign Bills of Lading for the carriage of cargo to any place to which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped. 706 707 708
Charterers shall procure that all Bills of Lading issued under this charter shall contain the following clause: 709 710

"If any laws rules or regulations applied by the government of the country in which the cargo was produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo to the place of discharge designated in or ordered under this Bill of Lading, carriers shall be entitled to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part of it as may be  affected, which  alternative place shall not be subject to the prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 hours after they or their agents have received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place on which they or the master may in their or his absolute discretion decide and which is not subject to the prohibition, and such discharge shall constitute due performance of the contract contained in this Bill of Lading so far as the cargo so discharged is concerned". 711 712 713 714 715 716 717 718 719 720 721
The foregoing provision shall apply mutatis mutandis to this charter, the references to a Bill of Lading being deemed to be references to this charter. 722 723

**Business Principles**  41.  Owners will co-operate with Charterers to ensure that the "Business Principles", as amended from time to time, of the Royal Dutch/Shell Group of Companies, which are posted on the Shell Worldwide Web (www.Shell.com), are complied with. 724 725 726

**Drugs and Alcohol**  42.  (a) Owners warrant that they have in force an active policy covering the vessel which meets or exceeds the standards set out in the "Guidelines for the Control of Drugs and Alcohol On Board Ship" as published by the Oil Companies International Marine Forum (OCIMF) dated January 1990 (or any subsequent modification, version, or variation of these guidelines) and that this policy will remain in force throughout the charter period, and Owners will exercise due diligence to ensure the policy is complied with. 727 728 729 730 731 732
(b) Owners warrant that the current policy concerning drugs and alcohol on board is acceptable to ExxonMobil and will remain so throughout the charter period. 733 734

**Oil Major**  43.  If, at any time during the charter period, the vessel becomes unacceptable to any Oil Majors Charterers 735

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (*incorporating ST4 Version 1.1 Apr06 plus additional clauses*)

| | | |
|---|---|---|
| Acceptability | shall have the right to terminate the charter. two of the following Oil Majors (Total, Exxon, Chevron, BP, Conoco, ENI or Statoil) Charterers will give notice to Owners and Owners will have a period of 45 days from the date Owners are notified for reinstating the approval(s). After 45 days, if the vessel is still unacceptable to two or more of the above mentioned Oil Majors, Charterers have the right to place the vessel off-hire until such time that Owners reinstate the Oil Major approval(s), the vessel is again acceptable to those Oil Majors, subject to trading pattern, availability of inspectors and willingness to inspect. | 736 |

b)   If at any time during the charter period, the vessel becomes unacceptable to more than two of the following Oil Majors (Total, Exxon, Chevron, BP, Conoco, ENI or Statoil) Charterers have the right to place the vessel off-hire until such time that the vessel is again acceptable to those Oil Majors, subject to trading pattern, availability of inspectors and willingness to inspect. Once the vessel becomes unacceptable to a third Oil Major (as defined above) the off-hire period shall be effective from original notice to Owners of putting the vessel off-hire

c)   During the period the vessel is off-hire, Owners have the right to trade the vessel for their own account to enable inspections of the vessel at discharge port locations.

| | | | |
|---|---|---|---|
| Pollution and Emergency Response | 44. | Owners are to advise Charterers of organisational details and names of Owners personnel together with their relevant telephone/facsimile/e-mail/telex numbers, including the names and contact details of Qualified Individuals for OPA 90 response, who may be contacted on a 24 hour basis in the event of oil spills or emergencies. | 737 738 739 740 |
| ISPS Code/US MTSA 2002 | 45. (a) | (i)   From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) and the US Maritime Transportation Security Act 2002 (MTSA) in relation to the Vessel and thereafter during the currency of this charter, Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) and the "owner"(as defined by the MTSA) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company" and the requirements of MTSA relating to the vessel and the "owner". Upon request Owners shall provide documentary evidence of compliance with this Clause 45(a) (i). | 741 742 743 744 745 746 747 748 749 |
| | | (ii)   Except as otherwise provided in this charter, loss, damage, expense or delay, caused by failure on the part of Owners or "the Company"/"owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for Owners' account. | 750 751 752 753 |
| | (b) | (i)   Charterers shall provide Owners/Master with their full style contact details and shall ensure that the contact details of all sub-charterers are likewise provided to Owners/Master. Furthermore, Charterers shall ensure that all sub-charter parties they enter into during the period of this charter contain the following provision: "The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners". | 754 755 756 757 758 759 |
| | | (ii)   Except as otherwise provided in this charter, loss, damage, expense or delay, caused by failure on the part of Charterers to comply with this sub-Clause 45(b) shall be for Charterers' account. | 760 761 762 |
| | (c) | Notwithstanding anything else contained in this charter costs or expenses related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for Charterers' account, unless such costs or expenses result solely from Owners' negligence in which case such costs or expenses shall be for Owners' account. All measures required by Owners to comply with the security plan required by the ISPS Code/MTSA shall be for Owners' account. | 763 764 765 766 767 768 769 |
| | (d) | Notwithstanding any other provision of this charter, the vessel shall not be off-hire where there is a loss of time caused by Charterers' failure to comply with the ISPS Code/MTSA(when in force ). | 770 771 772 |
| | (e) | If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party. | 773 774 775 |
| Law and Litigation | 46. (a) | This charter shall be construed and the relations between the parties determined in accordance with the laws of England. | 776 776 |
| | (b) | All disputes arising out of this charter shall be referred to Arbitration in London in accordance with the Arbitration Act 1996 (or any re-enactment or modification thereof for the time being in force) subject to the following appointment procedure: | 777 778 779 |
| | | (i)   The parties shall jointly appoint a sole not later than 28 days after service of a request in writing by either party to do so. | 780 781 |
| | | (ii)   If the parties are unable or unwilling to agree the appointment of a sole arbitrator in accordance with (i) then each party shall appoint one arbitrator, in any event not later | 782 783 |

Code word for this Charter Party
"SHELLTIME 4"

MAR11 Update (incorporating ST4 Version 1.1 Apr06 plus additional clauses)

|  | | |
|---|---|---|
| | than 14 days after receipt of a further request in writing by either party to do so. The | 784 |
| | two arbitrators so appointed shall appoint a third arbitrator before any substantive | 785 |
| | hearing or forthwith if they cannot agree on a matter relating to the arbitration. | 786 |
| (iii) | If a party fails to appoint an arbitrator within the time specified in (ii) (the "Party in | 787 |
| | Default"), the party who has duly appointed his arbitrator shall give notice in writing to | 788 |
| | the Party in Default that he proposes to appoint his arbitrator to act as sole arbitrator. | 789 |
| (iv) | If the Party in Default does not within 7 days of the notice given pursuant to (iii) make | 790 |
| | The required appointment and notify the other party that he has done so the other party | 791 |
| | may appoint his arbitrator as sole arbitrator whose award shall be binding on both | 792 |
| | parties as if he had been so appointed by agreement. | 793 |
| (v) | Any Award of the arbitrator(s) shall be final and binding and not subject to appeal | 794 |
| (vi) | For the purposes of this clause 46(b) any requests or notices in writing shall be sent | 795 |
| | by fax, e-mail or telex and shall be deemed received on the day of transmission. | 796 |
| (c) | It shall be a condition precedent to the right of any party to a stay of any legal proceedings in | 797 |
| | which maritime property has been, or may be, arrested in connection with a dispute under this | 798 |
| | charter, that that party furnishes to the other party security to which that other party would | 799 |
| | have been entitled in such legal proceedings in the absence of a stay. | 800 |

Confidentiality 47. All terms and conditions of this charter arrangement shall be kept private and confidential     801

Construction 48. The side headings have been included in this charter for convenience of reference and shall in no     802
  way affect the construction hereof.     803

Appendix A:     OCIMF Vessel Particulars Questionnaire for the vessel, as attached, shall be     804
                Incorporated herein.     · 805

Appendix B:     Shell Safety and Environmental Monthly Reporting Template, as attached, shall be     806
                Incorporated herein.     807

Additional Clauses:   1 through 20 as attached, shall be incorporated herein.     808

SIGNED FOR OWNERS                      SIGNED FOR CHARTERERS     809

FULL NAME_____                        FULL·NAME _____     810

POSITION _____                        POSITION _____     811

## 1. Bunker Emissions
See Clause 5


## 2. Stopia/Topia

Owners warrant that where the vessel is a "Relevant Ship", they are a "Participating Owner" as defined, as applicable, in the Small Tanker Oil Pollution Indemnification Agreement ("STOPIA") or in the Tanker Oil Pollution Indemnification Agreement ("TOPIA"), and that the vessel is entered in STOPIA or TOPIA (as applicable) and shall so remain during the currency of this charter provided always that STOPIA or TOPIA (as applicable) is not terminated in accordance with its provisions.


## 3. AMS Clause for Time Charters:

A. If the vessel loads or carries cargo destined for the United States or passing through US transit, charterers shall comply with the current US Customs regulations (19 CFR 4.7) or subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

1. Have in place a SCAC ("Standard Carrier Alpha Code")
2. Have in place an ICB ("International Carrier Bond"); and
3. Submit a cargo declaration by AMS ("Automated Manifest System") to the US Customs and provide the owners at the same time with a copy thereof.

B. Should any failure of Charterers to comply with this clause result in any delay then, notwithstanding any provision in this charter party to the contrary, the vessel shall remain on hire.
C. If the charterers ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the owners, the owners shall promptly reimburse charterer for those amounts.
D. The assumption of the role of the carrier by charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of the carrier under any bill of lading, other contract, law or regulation.


## 4. New Equipment Clause:

If any of the major oil companies institute new requirements for new equipment/features, always compatible with vessel's design and characteristics, and such requirements become necessary in order to maintain customers' approval, the sharing of time and cost of material and installation will be discussed between Charterers and Owners. During these discussions, appropriate consideration will be given regarding the potential effect of the new requirements on the available fleet of similar vessels and the market. If it is reasonable to conclude that the additional requirements will result in higher spot rates, thereby resulting in increased hire rates to owners, such costs for new equipment shall be for owners account.


## 5. Sulphur Emissions Clause

1. (a) Should Charterers trade the Vessel into a SOx Emission Control Area ("SECA") as defined in Annex VI of the International Convention for the Prevention of Pollution from Ships ("MARPOL"), or into a Member State of the EU following the entry into force of EU Directive 2005/33/EC of 6th July 2006 (the "Directive"), then the Charterers shall supply fuels: (i) of such specifications and grades that will comply with the maximum sulphur content requirements of the SECA or Directive as applicable, except that  in the case of the Directive the Charterers shall only be obliged to supply compliant gasoil; and in the case of  the SECA (ii) from bunker suppliers who comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

(b) Owners warrant, in the event the vessel trades in a SECA, or into a Member State of the EU following the entry into force of the Directive, that the Vessel: (i) complies with Regulation 14 and 18 of MARPOL Annex VI and with the requirements of the SECA or the Directive as applicable; (ii) is able to consume fuels of the required sulphur content when ordered by the Charterers to trade within the SECA or in a Member State of the EU in which the Directive applies; and (iii) will provide segregated storage for this fuel. Subject to having supplied the Vessel with fuels in accordance with this clause, the Charterers shall not be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's non-compliance with Regulations 14 and 18 of MARPOL Annex VI. (c) or the Directive. Subject to having supplied the Vessel with fuels in accordance with this clause, the Charterers shall not be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's non-compliance with Regulations 14 and 18 of MARPOL Annex VI or the Directive.

6. Piracy Clause

Sub-Clause (1). If the vessel proceeds to or through an area in which there is a current risk of piracy, verified by a competent international authority, Owners will at all times adhere to the latest version of Best Management Practices (including with respect to routing) ("BMP"), and Owners shall be entitled:

(a) to take reasonable preventative measures to protect the vessel, her crew and cargo by proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course;

(b) to follow any orders given by the flag state, any governmental or supra governmental organization; and

(c) where there is an actual, imminent act of piracy, to take a safe and reasonable alternative route in place of the normal, direct or intended route to the next port of call, provided that such alternative route does not, in the case of the Gulf of Aden, physically extend beyond the transit of the Gulf of Aden in which case Owners shall give Charterers notice as soon as reasonably practicable of the alternative route, an estimate of time and bunker consumption and a revised estimated time of arrival.

Sub-Clause (2). Subject to sub-Clause (5) below, Charterers shall pay Owners' reasonable, documented costs and expenses in respect of any additional hull and machinery, and/or, if applicable, war risks insurance premiums and/or other insurance against the risk of piracy, and/or additional, reasonable and contractual, crew costs arising out of actual or threatened acts of piracy or any preventive or other measures taken by Owners pursuant to Sub-Clause 1(a) of this Clause.

Sub-Clause (3). The vessel shall remain on-hire for any time lost taking the measures referred to in Sub-Clause 1 of this Clause.

Sub-Clause (4). Where, notwithstanding the taking of any of the measures referred to in sub-Clause 1 above, and where not caused by a lack of due diligence on Owners' part, and where Charterers have not exercised the option to require Owners to purchase off-hire insurance pursuant to sub-Clause (5) below, the vessel is captured by pirates, hire shall be payable at 100% of the hire rate for the duration of any such capture.

Sub-Clause (5). Charterers shall have the option, where the vessel is scheduled to transit the Gulf of Aden, or other areas of known piracy risk, to require Owners to either:
(a) extend existing war risk insurance; or
(b) purchase off-hire insurance, charter hire to be the previous month's daily hire rate or USD14,500/day, whichever is higher. "
which in either case will cover loss of hire, the cost of which shall be reimbursed by Charterers, provided always that:

  (i) Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under the foregoing insurances arising out of compliance with Charterers' orders;

  (ii) the terms of cover and cost have been disclosed to, and agreed by, Charterers prior to the purchase of such insurance; and

  (iii) that following the exercise of such option, the vessel shall go off-hire for any time lost as a result of a capture by pirates.

Sub-Clause (6). The safety and protection of crew and vessel is Owners' obligation and it is for Owners to determine the level of threat and the measures considered appropriate to discharge that obligation. If Owners deploy government-supplied Military Armed Guards or Private Armed Guards, then it is an express condition of this charter that Owners will, on a voyage-by-voyage basis:

(a) give Charterers advance notice of such intended deployment as soon as reasonably practicable but not less than five (5) days' notice prior to such deployment and throughout such voyage Owners will adhere to the response submitted in the Vessel Security Questionnaire;

(b) confirm in advance of deployment that such deployment has been notified to Owners' P&I and War Risks underwriters without objection (with evidence, satisfactory to Charterers, of Owners' exchanges with underwriters);

(c) ensure in advance of, and throughout, any deployment that such deployment complies with all flag state requirements, laws of the flag state, and any other applicable laws; and

(d) continue to adhere to the latest BMP.

Sub-Clause (7). All reasonable costs and expenses directly associated with the deployment of government-supplied Military Armed Guards and/or Private Armed Guards and/or unarmed guards shall be split 50:50 between Owners and Charterers. In the event unarmed guards are used, all reasonable costs and expenses directly associated with the deployment of unarmed guards to be for Charterers' account with Charterers' portion capped at US$[-] per voyage. In either case, subject always to Owners supplying documentary evidence of such total costs. Save as aforesaid, Owners will indemnify and hold Charterers harmless against all claims, liabilities, costs and expenses of whatsoever nature which arise directly in connection with the deployment of government-supplied Military Armed Guards and/or Private Armed Guards and/or unarmed Guards.

## 7. Marine Letter of Indemnity

Further to this charter the vessel may be required to carry out other such cargo operations as Charterers may reasonably require, including but not limited to one or more of the following and always provided weather and voyage permitting, as well as that the vessel is capable of such operations.

i) to commingle different grades of cargo providing such grades fall within the cargo description set out in this charter,

ii) to breach vessel's natural segregation,

iii) to dope the cargo with additive supplied by Charterers.*

iv) to add dye supplied by Charterers to the cargo,*

v) to blend cargo on board,*

vi) to carry additives/dye supplied at loading port in drums on deck,

vii) to load and discharge freshwater or seawater shore line flush/line plug before, during or after a cargo loading operation

* These operations shall be carried out or supervised by an inspector appointed by the Charterers.

Upon receipt of Charterers' written Instructions in respect of the foregoing a Letter of Indemnity in the following form will be deemed to have been provided by Charterers.

In consideration of Owners complying with Charterers' above request, Charterers hereby agree as follows:

1. To indemnify Owners, Owners servants and agents and to hold all of them harmless in respect of any liability, loss, damage or expense of whatsoever nature and which they may sustain in connection with complying with Charterers' request including loss or damage caused by an inspector appointed by Charterers, except to the extent that such liability, loss, damage or expense could have been avoided by the exercise of due diligence by Owners.

2. In the event of any proceedings being commenced against Owners or any of Owner's servants or agents in connection with complying with Charterers request as aforesaid, to provide them on demand with sufficient funds to defend the same, provided however that Charterers shall be consulted in the preparation of defence of any such proceedings.

3. If in connection with complying with Charterers' request as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify Owners in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified subject to Charterers' involvement in any negotiations in the provision of such bail or security.

4. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon Owners proceeding first against any person, whether or not such person is party to or liable under this indemnity.

5.     This indemnity shall be limited in value to 200% of the CIF value of the total cargo onboard and shall terminate at 24.00 hours on the day 36 calendar months after the date of discharge unless before that time Charterers have received from Owners written notice of a claim pursuant to this indemnity.

6.     This indemnity shall be governed by and construed in accordance with English law and each and any dispute arising out of or in connection with this indemnity shall be subject to the jurisdiction of the High Court of Justice of England.

## 8. Vessel Disposal

The Owners will not, without the prior written consent of Charterers, sell, lease, transfer or dispose of any interest in the vessel during the term of this charter.

## 9. CO2 Emissions

9.1  Where a Governmental Authority or other competent local or international regulatory body (including but not limited to the EU, the USA or the IMO) imposes upon Charterers an obligation to control, reduce or in any way account for ship-borne CO2 emissions ("Emissions Targets"), without prejudice to the terms and conditions in this charter, Owners  will co-operate with Charterers, including by following all reasonable orders, in order to facilitate Charterers' compliance with the Emissions Targets.

9.2  Any carbon credits gained during the performance of this charter, whether by following Charterers' orders pursuant to Clause 12.1, or otherwise, will be recorded by a process to be mutually agreed and will be for the account of Charterers.

## 10. Pumping

Owners warrant that the Vessel shall be fitted with  cargo pumps which, when the Vessel is laden with a homogeneous cargo, are capable of: discharging her full cargo within 24 hours or of maintaining an average pressure of 100 PSI at ship's rail provided that shore facilities permit and excluding time required for stripping and COW operations

## 11. Heating

Owners warrant that the Vessel is capable of;

1. Maintaining crude and dirty petroleum cargoes at loaded temperature but maximum up to 145 degrees Fahrenheit.
2. If time/voyage permits, raising cargo temperature up to a maximum temperature of up to 145 degrees Fahrenheit.
3. Maximum loading temperature shall not exceed 165 degrees Fahrenheit.

Charterers to allow Owners sufficient time for the Vessel to raise temperature bearing in mind length of laden passage, outside ambient air and sea temperatures and weather conditions.

## 12. Cargo Retention

In the event that any cargo remaining on board upon completion of discharge is liquid (+) and pumpable and reachable by Vessel's means as determined by an independent surveyor, Charterers shall have the right to deduct from hire, when deemed reasonable, the value of this liquid equal to the f.o.b. port of loading value of such cargo, plus prorata freight and insurance due with respect thereto.

Charterers hereby agree to indemnify Owners against any liability, under this clause, to a Bill of Lading holder resulting from non-delivery of any such cargo in respect of which a deduction from freight is made provided, however, that Charterers shall in no event be liable to indemnify Owners in an amount greater than the amount of the deduction from freight.

Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.

This clause does not apply unless Charterers can demonstrate to Owners that they themselves have suffered an identical loss as a result of cargo remaining on board by way of deduction from sub-time Charterer hire or retention of freight.

(+) note :
R.o.b. will be considered liquid if:
It can be sampled and tests show that it has a dynamic viscosity of less than 600 centipoise by rheometric testing, using a Ferranti, Brookfield or similar viscometer, at the temperature it has when in the ship's tanks

## 13. Bunker Quality/Off Spec Bunkers:

Should bunker analysis confirm that bunkers are off-spec, (as per agreed specification in appendix C with Vessel bunker description ), Owners will notify Charterers and provide the bunker analysis performed by DNV and Charterers will be notified regarding Owners intentions. Should Owners agree to use the bunkers supplied then Charterers are not entitled to present Owners with a speed or consumption claim for any period during which Vessel is using bunkers that do not meet the specified requirements. Owners shall not be obliged to use bunkers not within the agreed specs in this charter.

If Owners and Charterers cannot find a solution for the consumption of off-spec bunkers then, upon request of Owners, Charterers are to arrange to pump out off-spec fuel at their own time and expense and vessel to remain on-hire.

Charterers reserve the right to appoint an independent inspector to witness the re-testing of the alleged off spec bunkers.

## 14. Ship to Ship Lightering:

Charterers have the option to load or discharge the Vessel via ship-to-ship transfer, weather permitting and subject to Master's approval, which is not to be unreasonably withheld.

Charterers to provide and pay for all necessary equipment, including hoses and adequate and sufficient number of Yokohama or Yokohama-style fenders, for such safe lightering operation to Master's full satisfaction. Charterers shall arrange supervisory personnel on board, including mooring Master to assist the performance of the lightering operations.

Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-To-Ship Transfer Guide.

The master has the right to suspend the lightening operation, if in his sole opinion, the safety of the Vessel or the smooth conduct of the operation is in jeopardy, in which case the Vessel will remain on hire and all expenses will be for Charterers' account.

## 15. USA Trading/TVEL CL

Any time lost during which the Vessel awaiting U.S. Coast Guard TVEL inspection, or in the case of calls at non-U.S. ports where any similar certificate is required to be issued by a state authority prior to loading or discharging cargo, and until such time as she has secured TVEL certificate / COC or any similar certificate, Vessel will be considered on hire provided that Vessel is found acceptable. All relevant TVEL / COC etc costs to be Charterers account.

## 16. BIMCO EU Advance Cargo Declaration Clause for TC Parties

(a) If the Vessel loads cargo in any EU port or place destined for a port or place outside the EU or loads cargo outside the EU destined for an EU port or place, the Charterers shall comply with the current EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and in their own name, time and expense shall:

(i) Have in place an EORI number (Economic Operator Registration and Identification);

D01274
Case ID: 200300816

(ii) Provide the Owners with a timely confirmation of (i) above as appropriate; and

(iii) Submit an ENS (Entry Summary Declaration) cargo declaration electronically to the EU Member States' Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the EU Advance Cargo Declaration Regulations shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## 17. Shell Anti-Bribary Clause

Owners and Charterers (either directly or through any of their affiliates', directors, officers, employees, masters, crewmembers, agents, managers, representatives or parties acting for or on behalf of them or their affiliates) shall:

a) comply with the applicable laws, rules, regulations, decrees and/or official government orders, including but not limited to the United Kingdom Bribery Act of 2010 as amended and the United States of America Foreign Corrupt Practices Act of 1977 as amended, or any other applicable jurisdiction, relating to anti-bribery and anti-money laundering and that they shall each respectively take no action which would subject themselves or the other to fines or penalties under such laws, regulations, rules, decrees or orders ("Relevant Requirements");

b) not make, offer or authorise, any payment, gift, promise, other advantage or anything of value whether directly or through any other person or entity, to or for the use and benefit of any government official or any person where such payment, gift, promise or other advantage would comprise or amount to a facilitation payment and/or violate the Relevant Requirements;

c) have and shall maintain in place throughout the term of this Charter its own policies and procedures to ensure compliance with this clause, and will enforce them where appropriate;

d) promptly report to the other party any request or demand for any payment, gift, promise, other advantage or anything of value received by the first party in connection with the performance of the Charter; and

e) have the right to audit the other party's records and reports in relation to this Charter at any time during and within seven (7) years after termination of the Charter. Such records and information shall include at a minimum all invoices for payment submitted by the other party along with complete supporting documentation. The auditing party shall have the right to reproduce and retain copies of any of the aforesaid records or information. If there are anti-trust issues with or a party objects to a direct audit, the auditing party may appoint an independent company who is approved by the audited party (such approval not to be unreasonably withheld and to be given within 7 days of the request) to conduct the audit and provide the auditing party with its findings on the audited party's compliance with the Relevant Requirements without disclosing the records or information to the auditing party.

Either Owner or Charterer may terminate the Charter at any time upon written notice to the other, if in their reasonable judgment supported by credible evidence the other is in breach of this clause or such a breach is imminent. The timing of this entitlement (which shall be at the non-breaching party's discretion) is either:
   i) with immediate effect at any time prior to commencement of loading; or
   ii) if the laden voyage has not been completed and the cargo discharged, once the laden voyage has been completed and the cargo discharged.

This right shall be without prejudice to any other rights the non-breaching party may have in respect of such breach.

## 18. Hull Scrub & Propeller Polish

Charterers may request additional intermediate hull scrubs or propeller polishes, "Charterers Additional Hull Scrub & Propeller Polish". Upon Charterers making such a request Owners will make best efforts to arrange this

at the next available and suitable port. Charterers shall release the Vessel to Owners who shall pay for all costs associated with the hull scrub and propeller polishes, including but not limited; survey costs, inspection costs, diving costs, cleaning costs and any berth and anchorage costs.  Owners will invoice Charterers for the costs with the next monthly hire statement. Owners will provide Charterers with a cost estimate of the operations no later than five (5) days before the operation is due to take place, for Charterers approval. The time spent hull scrubbing and cleaning shall not count as off hire time pursuant to Cl.21 of the Charter Party and Owners shall invoice Charterers for those approved costs with the next monthly hire statement.

## 19. Time Bar

All claims for additional costs and expenses recoverable by Owners from Charterers pursuant to (i) Clause 7 ("Charterers to Provide"), (ii) Clause 34 ("Additional War Expenses") and (iii) Additional Clause 4 ("Piracy") must be received from Owners by Charterers in writing along with supporting documentation within one hundred and twenty (120) days of the relevant voyage being completed (where the voyage is deemed to be completed upon completion of discharge and disconnection of hoses at the final discharge port) otherwise Charterer's liability for such costs shall be extinguished

## 20. Electronic Bills of Lading

Notwithstanding anything contained in this charter,  Charterers may, at their sole discretion, require the Owner to issue and sign in electronic form and transmit electronically any Bill of Lading to be issued pursuant to clause 13(an "eDoc").

It is expressly agreed that any applicable requirement of law, contract, custom or practice that any Bill of Lading issued pursuant to this charter  shall be made or evidenced in writing, signed or sealed, shall be satisfied by such eDoc and the parties agree not to contend in any dispute arising out of or in connection with any eDoc or any eDoc which has been converted to paper that such eDoc is invalid on the grounds that it is not in writing or that it is not equivalent to an original paper document signed by hand, or, as the case may be, sealed.

Specifically, eDocs systems which shall be used for these purposes include the ESS-Databridge™.

## APPENDIX A

Vessel hire rate will be determined in accordance with the TD7 formula as below.

### 1. BITR Route TD7

- The average WS rate assessment for the month in question for the Baltic Exchange's BITR TD7 route will be inserted into the attached formula.
- Charterers to pay a base hire rate of USD 17,500 pdpr. If the Time Charter Equivalent (TCE) calculated in accordance with the attached formula falls between the base hire rate and a ceiling hire rate of USD 45,000 pd, fifty (50) percent of the amount the TCE exceeds the base rate will be added to the hire. In the event the TCE exceeds the ceiling hire rate (USD 45,000 pd) one hundred (100) percent of such excess is to be added to the hire.
- The worldscale flat rate in effect for the model voyage on the first day of the month.
- Actual vessel consumptions for IFO and MGO on the voyage parameters (14.5 knots / 2 days load, 2 days discharge, etc)
- The Platts bunkerwire mean of quotes for the month in question for Rotterdam LS (1%) IFO 380
- The Platts bunkerwire mean of quotes for the month in question for LSMGO (0.1%)
- Port costs at load port (Sullom Voe) and discharge port (Wilhelmshaven) based on a proforma estimate of port costs as determined by a mutually agreed ship agency.
- For the optional period, Owners' option to either maintain the above rate mechanism or to revert to full floating mechanism.

a. Contingencies:

i. The BITR rates, using the above assumptions are published by the Baltic Exchange. In the event that the Baltic Exchange changes the assumptions currently made, and as set out above, the Parties shall either agree that the new assumptions may be used to fix the rates, or, if no agreement can be reached, the current assumptions shall remain and the Charter rates shall continue to be fixed using such current assumptions. In the event that the Baltic Exchange ceases, for whatever reason, to publish the BITR rates, or, if, the Parties have not agreed to use the any new assumptions published by the Baltic Exchange and cannot agree the rates using the current assumptions, the rates shall be fixed, instead by the London Tanker Brokers Panel who shall be jointly appointed and paid for by both Parties. The London Tanker Brokers Panel shall use the same assumptions as mentioned above in relation to route TD7

ii. Worldscale/Baltic Exchange may introduce new or remove or change current fixed differentials (like OPA, ECA, change of port for bunker price etc.) and/or may amend the TCE Calculation Processes, in which case same to be incorporated to robin formulae accordingly provided consistent with underlying market practice.

iii. Should bunker regulations change such that different quality of bunkers are required, such new quality to be included as the benchmark bunker price for the assessment.

iv. In the event port costs (in US Dollars) change by more than 5% in either direction, a new proforma may be obtained and the formula updated for the following months.

## TD 7 Formula

Ship Specific 
Determined Monthly
Sullom Voe / Wilhelmshaven

| | |
|---|---|
| WS Rate | WS |
| Bunker (LSFO) Price | |
| MDO Price | |
| Port cost (Load) | $ |
| Port cost (Discharge) | $ |
| | |
| Flat Rate | 7.85 |
| Cargo Qty | 80,000 |
| ECA DIFFERENTIAL | $ |
| Income | $ |
| | |
| Laden Distance | 597 |
| Ballast Distance | 598 |
| Laden Speed | |
| Ballast Speed | |
| Days Laden | 1.72 |
| Days Ballast | 1.72 |
| Weather Margin Laden (5%) | 0.09 |
| Weather Margin Ballast (5%) | 0.09 |
| Days Loading | 2.00 |
| Days Discharging | 2.00 |
| Days Idle/Anchor | 0.50 |
| | |
| Bunker Consumption | |
| – Laden | |
| – Ballast | |
| – Load | |
| – Discharge | |
| – Idle | |
| MDO Consumption | |
| – Laden (incl wx margin) | |
| – Ballast (incl wx margin) | |
| – Load | |
| – Discharge | |
| – Idle | |
| | |
| Bunker Cost | |
| – Laden (incl wx margin) | - |
| – Ballast (incl wx margin) | - |
| – Load | - |
| – Discharge | - |
| – Idle | - |
| MDO Cost | |
| – Laden (incl wx margin) | $ |
| – Ballast (incl wx margin) | $ |
| – Load | $ |
| – Discharge | $ |
| – Idle | $ |
| | |
| Commission (2.5%) | $ |
| Bunker Cost | - |
| MDO Cost | $ |
| Port Costs | $ |
| | |
| Total Costs | $ |
| | |
| Net Revenue | $ |
| | |
| Total Days | 8.11 |
| | |
| TCE | $ |

D01278
Case ID: 200300816

SHELL TIME 4

## APPENDIX B

| Shell Safety and Environmental Monthly Reporting Template | Return to: Shell Trading HSE & Shipping Standards |
|---|---|
| | Charterers marked for the attention of: OTS/43 |
| | Fax:   +44(0)20 7934 7472 |
| | Phone: +44(0)20 7934 8079 |
| | Email:  STASCOHSEData@shell.com |

| Time Chartered Vessel Name | |
|---|---|
| Management Company | |
| Month | |

| OIL SPILL INCIDENTS (Any amount entering the water) Approximate volume in barrels and brief details | |
|---|---|
| ANY OTHER INCIDENTS resulting in or having potential for injury, damage or loss | |

FOR DEFINITIONS OF INCIDENT CLASSIFICATION AND EXPOSURE HOURS PLEASE SEE OIL COMPANIES INTERNATIONAL MARINE FORUM (OCIMF) BOOKLET "Marine Injury Reporting Guidelines" (February 1997) or any subsequent version, amendment, or variation to them

| A. No. Of crew: | |
|---|---|
| B. Days in month / period: | |
| EXPOSURE HOURS  (A x B x 24): | |

| LOST TIME INJURIES (LTI'S) including brief details  / any treatments |
|---|
| |

| TOTAL RECORDABLE CASE INJURIES (TRC'S) including brief details / any treatments |
|---|
| |

PLEASE CONFIRM YOUR RETURN CONTACT DETAILS:

| Name: | |
|---|---|
| Phone: | |
| Fax: | |
| Email: | |

D01279
Case ID: 200300816

Return for each calendar month -- by 10th of following month.

| Shell Safety and Environmental Monthly Reporting Template | Return to: Shell Trading HSE & Shipping Standards<br>Charterers marked for the attention to: OTS/43<br>Fax:   +44 (0)20 7934 7472<br>Phone: +44 (0)20 7934 8079<br>Email:  STASCOHSEData@shell.com |
|---|---|

| Time Chartered Vessel Name | |
| Management Company | |
| Month | |

Notes :   Please enter zero i.e. "0" where any amount is nil (rather than entering "Nil" or N/A")
Please do not enter a % sign in the entry boxes for Fuel Sulphur content i.e. if it is 3% then just enter "3".
Cargo loaded for LNG vessels should also be reported as tonnes and not as m³.
If not possible to measure your refrigerants accurately by weighing, please use best estimate.

| Monthly Consumption -- Fuel Oil mt | |
|---|---|
| Sulphur content of Fuel Oil (percentage weight) | |
| Monthly Consumption -- Diesel and/or Gas Oil mt | |
| Monthly Consumption (LNG ships only) -- Fuel Gases mt | |

| Monthly Distance Steamed | |
|---|---|
| Monthly Cargo Loaded -- mt | |

| Halon Release -- (ltrs) | |
|---|---|
| Refrigerant Gas -- Type | |
| Refrigerant Gas -- ROB carried fwd from end last month (kgs) | |
| Refrigerant Gas -- Received (kgs) | |
| Refrigerant Gas Consumption -- (kgs) | |
| Refrigerant Gas -- ROB end of this month (kgs) | |

| Garbage Disposal m3 -- At Sea | |
|---|---|
| Garbage Disposal m3 -- Incinerated on Board | |
| Garbage Disposal m3 -- Sent Ashore | |

| OIL SPILL INCIDENTS<br><br>(Other than those entering the water)<br>Approx. volume & brief details | |
|---|---|

D01280

Case ID: 200300816